**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

FILED

2004 MAR 19 P 2: 02

U.S. DISTRICT COURT
BRIDGEPORT CONN

NICHOLAS O. RUSSO, JR.,        :

      PLAINTIFF        :

vs.        :

CITY OF HARTFORD, ET AL.        :

CIVIL ACTION NUMBER:
3:97CV2380(JCH)(lead case)
3:00CV2382(JCH)
3:00CV1794(JCH)

MARCH 18, 2004

### JOINT LOCAL RULE 56(a)2 STATEMENT IN OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Pursuant to Rule 56(a)2 of the Local Rules of Civil Procedure, Plaintiff Nicholas Russo ("Russo") hereby submits his statement of material facts as to which it is contended there are genuine issues to be tried.:

### I.  RUSSO'S EMPLOYMENT HISTORY

1.  In approximately July 1995, Russo was assigned to the Federal Violent Crimes Task Force.  (Russo Dep., 6/12/02 at 184.)

2.  In approximately July 1995, Russo was the head investigator for the Federal Violent Crimes Task Force and assisted Federal Agents in arresting gang members guilty on the murder of Marcelina Delgado. (The Hartford Police Department ("HPD") had arrested the wrong person.)  (Lyons Dep., at 209.)

3.  In a letter to Chief Croughwell ("Croughwell"), Peter Markle, Chief of the Organized Crime Drug Enforcement Task Force confirmed Russo's active participation with Federal Investigations.  (Exhibit 31.)

4.  On July 21, 1997, Russo was transferred to the Task Force and his assignment

responsibilities were detailed. (Exhibit 33.)

5.   Over his career, Russo has twenty-eight investigations leading to twenty-eight

convictions of homicides.  Croughwell considered him a good homicide detective.

(Croughwell Dep., at 222-23.)

6.   Prior to Russo's arrest he did not fail to report for assignments in the Task Force.

(Huertas Dep. at 76.)

7.   Russo was a good homicide detective. (Croughwell Dep. at 222-23.)

8.   Russo was detailed, dedicated and successful at his work, successes included solving the

murder of Marcelina DelGado, while part of the Fed. Gang Task force, which lead to the

conviction of the murderers by federal prosecutors. (Huertas Dep. at 30, 32.)

9.   Russo had "phenomenal" success in developing informants. (Huertas Dep. at 33.)

10.  Russo was very careful and versatile as a Union Steward. (Huertas Dep. at 44.)

11.  Sergeant Huertas ("Huertas") was Russo's supervisor on the gang task force. (Huertas

Dep. at 45.)

12.  Russo was "a good officer, very loyal, very dedicated, highly decorated, and he was a

team  player.  And our mission was to basically put the bad guys away." (Huertas Dep. at

49.)

13.  There was no deterioration in Russo's work performance in 1997, before his arrest.

Huertas Dep. at 49.)

14.  Russo was not a "dirty cop" and was credible (Durham Dep. at 16-17, 82.)

15.   US Attorney John Durham ("Durham") thought that Russo was "extraordinarily hard

working.  He worked an incredible number of hours.  He essentially never said no when

you asked something be done, even if it was an inconvenient  time and he had already

worked a lot of hours.  You could  pretty much rely on -- pretty much rely -- you could

rely  on what he told you on what witnesses told him.  If we brought a person into the

grand jury, for example, to be questioned, what the person would provide to us as a

general rule would be consistent with what Detective Russo had written up or advised

the witness had   said.  That's my general experience with Detective Russo." (Durham

Dep. at 82.)

16.     Russo's job performance was not an issue during 1997, as Durham stated:

"A. . . . .You know, there were people saying that Nicky is using prescription drugs or
whatever.  And I told the chief, 'Look, I have not seen any indication of that,  which is
the truth then and is the truth now.'
Q    So he wasn't like late for work, missing assignments.  His behavior was not poor in
1997?
MR. SHEA:  Objection to the form.
MR. HOWARD:  Objection to the form.
A    He was not missing assignments.  He was not missing work that I can recall.  In all
candor, I have to say that Russo was one of the person we could rely on to actually get
assignments done." (Durham Dep. at. 128.)

17.     There is no evidence that Russo bought misappropriated cigarettes. (Dunham Dep. at

82.)

**II.      CONFLICT BETWEEN HPD AND The Federal Government**

          **A.      Pope Park Murder**.

18.     On June 15, 1997, Enrique Ramirez, a gang leader, also known as "Rick the Ruler"  was

murdered at Pope Park in Hartford, CT.

19.     On June 16, 1997,  Russo worked with Federal Agents to arrest Julio Ramos.  The

federal investigation focused on Ramos after Ramos had been audio-taped under

surveillance, admitting to the murder and to where he had disposed of the murder

weapon.  (F.B.I. Sentencing Memorandum, Rivera v. Bailey, at 5, 7-9); (Lyons Dep. at

206.)

20.    The police defendants were angry with the swift and efficient investigation by the federal

authorities.  They were expecting to earn a significant amount of overtime pay working

on the case.  In the past they had earned significant overtime on an earlier murder

investigation, namely the Irma Horvath murder.  In fact, Leito actually named a truck he

bought with his overtime pay "Irma" after the victim of the murder.  (Rovella Dep. at

119-123.)

21.    The CAPers unit decided to pursue an independent investigation of the murder and

rebuffed efforts by the federal authorities to work jointly with CAPers.  (FBI Sentencing

Memo., Rivera v. Bailey, at 9.)  Mazzamurro created the initial posturing of the CAPers

unit opposing cooperation with federal authorities.  (FBI Sentencing Memo., Rivera v.

Bailey, at 9.)

22.    It was not until after the CAPers' investigation had progressed that Rivera had become a

suspect.  (Thomas Affidavit, Rivera v. Bailey, at 2-3.)  It was not until August 5, 1997

that a warrant for Rivera was drafted, (Thomas Affidavit, Rivera v. Bailey, at 3) , almost

two months after the federal warrant had been executed and Ramos had been taken into

custody.

23.    There was no progression in the Hartford Police investigation.  (Pitkin Dep., Rivera v.

Bailey, at 131-132.)

24.    Thomas directed then Assistant State's Attorney Joan Alexander to work on the arrest

warrant of Gilberto Rivera  with the Hartford Detectives and he was arrested on

December 26, 1997, five months after Ramos had confessed and was arrested for the

murder. (Thomas Dep., Rivera v. Bailey, at 54).

25.    CAPers failed to offer any assistance to the federal authorities in the arrest of Ramos

even though they were told in advance that an arrest was pending and when and where it

would take place.  (Thomas Dep., <u>Rivera v. Bailey</u>, at 49.)

26.    Rivera was arrested within weeks of Russo's arrest: On approximately, December 24,

1997, the second warrant was executed for Rivera.  (Arrest Warrant, <u>Rivera v. Bailey</u>.)

27.    Russo and Gilberto Rivera were conveniently arraigned on the same day at the Hartford

Superior Court:

"A    What I do remember is my recollection is when they were arraigned Nick Russo,
there were a number of police officers –
MR. HOWARD:  I'm sorry.  Could you speak up.
A    There were a number of police officers I recall that attended the arraignment,
inspectors, prosecutors.
Q    The state's attorneys' officials, right?
A    Yes.
Q    There weren't Hartford police officers there, were there?
A    Maybe they were inspectors from the state's attorneys' office.
Q    Prosecutors?
A    Yes.
Q    Do you have any rules in your office about sort of this voyeurism of defendants?  Is
there a rule or practice against having everyone in the prosecutors' office going down and
see somebody get arraigned? . . .
Q    Could you see any symbolism with that arraignment, any message sent to you or
people that work for the gang task force?
A    Sophomoric or otherwise?
Q    Yes.  I'm not giving anyone any credit for being professional or intelligent.
MR. SHEA:  Objection to the form.
A    If it were orchestrated that way, and I don't know that it is, that wouldn't surprise me
based upon my experience with some of these folks." (Durham Dep. at 132-34.)

**B.    <u>Tension Between HPD & Fed. Gang Task Force Members</u>**

28.    Lieutenant David Kenary ("Kenary") questioned Russo's loyalty to the HPD because of

his involvement and work with the Federal Government and testified that: "Nick Russo

forgot whose badge he was wearing." (Kenary dep., <u>Rivera v. Bailey</u>, at 92.)

29.    Karen Tabara ("Tabara"), the former senior administrative assistant to Croughwell over

heard Kenary and Flaherty say on numerous occasions: "Fuckin' Russo, we'll get him." (Tabara Testimony, Exhibit 35.)

30.   Kenary was angry at Russo for his involvement with the Federal Task Force. (Lawlor Dep. at 203.)

31.   Sergeant Daryl Roberts ("Roberts") felt that Russo had forgotten that he was a Police Officer because of his work with the federal agents. (Roberts Dep. at 165.)

32.   CAPers excluded the Fed. Gang Task Force members including: "There was a mandate, verbal from Chief Croughwell that we would be notified on all gang-related homicides. And I felt that we were left out of the loop and misinformed on homicides, particular homicides that were in fact gang related and they made a partial effort to notify us of acts of violence which I clearly knew based on my experience that they were 100 percent gang related.  Another example, the term I want to use is railroaded.  We went to serve a federal subpoena which was part of our duties and I got the distinct impression and also the person that was with me that the person that we were about to serve was pre warned that we were coming. . . . [by] member of the CAPers division."(Huertas Dep. at 55.)

33.   Following the Pope Park Murder, where the Fed. Task Force arrested Ramos for the murder, the CAPers Division, as well as Croughwell created a hostile work environment for members of the Federal Task force, specifically:

"A: A  rift that was caused when the task force arrested and indicted an individual responsible for a murder.
Q   Is this the Pope Park murder?
A   Yes.
Q   Can you describe some of the ways that you were  mistreated?
A   Once again, left out of the loop, not made privy to the statuses of certain investigations.
Q   You were a sergeant though, right?
A   Yes.  Authority was circumvented by  administration.  The veracity was questioned.

Q    Your veracity?
A    Oh, yeah.
Q    By whom?
A    Chief Croughwell. . . . A    I don't know if I mentioned this, but just overall mistrust from the detectives involved in the Hartford murder.
Q    Were you shunned by these people?
A    Yes." (Huertas Dep. at 71).

34.    Roberts was transferred because he disobeyed an order by Captain Robert Casati ("Casati") to send detectives to assist federal authorities in a homicide case. (Roberts Dep. at 166,184.)

35.    In 1997, Roberts felt that Russo should have been working with the police department not with the Federal Government, especially working on the Pope Park murder with the HPD not with the Federal Government. (Roberts Dep. at 165-66.)

36.    The HPD mistreated Russo while he worked with the Fed. Gang Task Force. (Durham Dep. at. 94-5.) Sergeant Christopher Lyons ("Lyons"), "was not particularly supportive of the joint effort that was being made by the task force.  There was relatively constant tension in these matters." (Durham Dep. at 135.)

37.    Refusing to assist the Federal Government in the Pope Park murder demonstrated the lack of cooperation between the HPD and the Fed. Gang Task Force. (Roberts Dep. at 198.)

38.    On June 29, 1996, Russo wrote a letter to Durham and Sergeant Charles Lilley ("Lilley"), to complain about the tensions between the HPD specifically how Lilley and Roberts were not cooperating or sharing information with the Federal Task Force which caused friction and dangerous situations. (Exhibit W.)

39.    Huertas testified as to the friction, stating:

"Q.  Is it fair to say that there was tension between agencies?

A   Yes.

Q   How would you describe that?

A   Laymen's terms, pissing contest.

Q   Between the federal investigation and the state?

A   Federal and the state, yes.

Q   Which side was Nick Russo on in this pissing contest?

MR. GOUMAS:  Object to the form.

MR. SHEA:  Objection to the form.

A   I think he was on the side of justice.  I don't think he was on one side or the other, just get

    to the truth.

Q   Is it fair to say he might have been caught in the middle of it?

A   Yes.

Q   Did Nick Russo want to make sure that someone like Gilberto Rivera was wrongly prosecuted and jailed?

MR. SHEA:  Objection to the form.

MR. GOUMAS:  Object to the form.

A   I think it would be fair that he would not want to have somebody wrongly prosecuted.

(Huertas Dep. at 112.)

## III.   THE DRUG FACTORY KIT

40.   Once evidence is seized it is tagged, inventoried, and placed in the property room, tested

or brought to the executive officer who will tag them.  Seized evidence is not to be kept

anywhere other than the property room. (Edelwich Dep. at 133; Miele Dep. at 58;

Huertas Dep. at. 25.)

41.   However, Lieutenant O'Connell ("O'Connell") found 147 bags of heroin and other

contraband outside of the property room in the Intelligence Division when he took over

the Intelligence Division from Lyons and detailed what was found in an inventory.

(Exhibit I -1.)

42.   Evidence is not to be kept in an officer's office or desk. There is no provision or policy

for an officer to keep drugs and drug paraphernalia for training purposes. (Huertas Dep.

at. 26.)

43.   Nor are officers allowed to keep evidence on their person on in their desk. (Miele Dep. at. 60.)

44.   To be in possession of 147 bags of heroin and other drug contraband would be a "Serious violation in department policy and possible criminal and state statutes." (Huertas Dep. at 115).

45.   "Due to the amount of narcotics and related paraphernalia found in the box, and the fact that it was not secured as required by Hartford Police policy this investigation was criminal in nature." (Exhibit I).

46.   The amount of drugs found by O'Connell provides probable cause to arrest the person for possession with intent to distribute and such amount is not indicative of a training purpose. (Flaherty Dep. at 39, 87.)

47.   Lawlor knew of the cocaine, heroin and marijuana stored in the Intelligence Division and had access to the drugs while he worked in the Intelligence Division. (Miele Dep. at 133, 137; Lawlor Dep. at 54.)

48.   The drugs were given to Sergeant Stephen Miele ("Miele") and Officer Michael Edelwich ("Edelwich") together at the same time, but neither can remember who gave them the drugs, when the drugs were given to them or where the drugs were given to them. (Edelwich Dep. at 67-69, 73; Steven Miele Dep. at 82, 128.)

49.   Miele can not remember if the drugs came from a West Hartford police officer or a Hartford Police Officer. (Miele Dep. at 84.)

50.   Miele does not know what a field sample is and does not know of any policy regarding "field samples". (Miele Dep. at 85.)

51.   Prior to testifying both Miele, Lawlor and Hasdasz spoke with Edelwich about being

deposed. (Edelwich Dep. at 47.)

52.     Miele's supervisor, Lyons testified that the Intelligence Division did not do training. (Exhibit I, COH 443.)

53.     However, Miele testified that The Drug Factory Kit was used for training purposes. (Miele Dep. at 89-90.)

54.     "Lawlor stated the drug box was already in the Intelligence Division prior to his arrival and he. . . did not conduct any drug training classes and he had no knowledge of where the box came from." (Exhibit I, COH 443.)

55.     The drug training classes are alleged to have occurred in 1995 and were not ongoing in 1997. (Miele Dep. at 119; Edelwich Dep. at 82.)

56.     Lawlor, Lyons, Miele and Edelwich maintained a Drug Factory Kit, in the Intelligence Division which contained at one point up to 147 bags of heroin, marijuana, cutting agents, and other drug paraphernalia and contraband. Edelwich and Miele stored the 147 bags of heroin in an unlocked credenza in the Intelligence office. (Miele Dep. at 79-80, 91; Edelwich Dep. at 58.)

57.     This Kit was used to plant drugs on gang members in order to effectuate arrests on gang members and other Hartford residents, which is a crime. Lyons, Lawlor and Edelwich's possession and access to the drug kit compromised their credibility as officers because they could have used the drugs to plant on gang members. (Huertas Dep. at 63; Croughwell Dep. at 77);

58.     Planting drugs on suspects is a felony and if Lyons, Lawlor and Edelwich were involved in such criminal actions they could be charged with a felony. (Huertas Dep. at 65).

59.     It is also a crime to take drugs and money from drug dealers.  (Flaherty Dep. at 32.)

60.     Lyons and Lawlor planted evidence on gang members during their tenure on the HPD.
(Croughwell Dep. at 77.)

## IV.     RUSSO INVOLVED IN CORRUPTION INVESTIGATION

61.     On October 13, 1997, Russo met with Inspector Stephen Kumnick of the State's
Attorney's Office at a soccer game.  Russo  discussed the federal corruption probe of the
HPD with which Russo was assisting the Federal Government.  (Russo Dep., 6/24/03, at
52-56, 115-16; Croughwell Dep. at 148, 194-95.)

62.     Detective Robert Lawlor ("Lawlor") told Croughwell that "he got a call  I believe it was
from Kumnick stating that Russo and Kumnick had a conversation at a soccer match that
their children were in.  Russo told Kumnick . . . . that the FBI was going to be doing an
investigation of corruption in the police department, to include Lawlor and Edelwich and
some bosses." (Croughwell Dep. at 148.)

63.     Russo spoke with Kumnick about the corruption probe as directed by the Federal
Government because Kumnick was a source of investigation about corruption in the
HPD, and was an inspector for the chief state's attorney's office. (Croughwell Dep. at
194-199.)

64.     On approximately March 9, 1998,  Russo voluntarily went to the F.B.I..(in Meridan), as
requested by the F.B.I., to work on an unsolved murder in Massachusetts (the Dog Man
Case) in which three Hartford police officers were suspects.  Russo met with F.B.I.
Special Agent Kevin Kline ("Kline") and two Massachusetts State Troopers.  (Russo
Dep. 6/24/03, at 59.)

65.     Croughwell defines corruption as: "an act either committed or an act of omission by a

-11-

police officer which is illegal or improper which causes that officer to receive some sort

of remuneration for the acts of omission or commission of an act, generally."

(Croughwell Dep. at 21.)

66. Croughwell knew of corruption at the HPD. (Croughwell Dep. at 22, 24.)

67. In a memorandum, from Kumnick to Chief Inspector David Best ("Best"), dated

10/30/97, the corruption case investigation is divulged to the HPD. (Exhibit 2).

68. Durham told Assistant U.S. Attorney Jim Glasser ("Glasser") to contact Russo to find

information about corruption in the HPD. (Durham Dep. at 38-39.)

69. Durham "told Nick Russo that Jim Glasser was going to conduct an investigation

involving corruption in Hartford. Would he be willing to talk to him." (Durham Dep. at

40.)

## V.    HPD INITIATES INVESTIGATION OF RUSSO

70. Croughwell ordered Captain Jeffrey Flaherty ("Flaherty"), to attend the meeting at the

State's Attorney's office and to discuss Russo. (Flaherty Dep. at 130.)

71. Kenary left a phone message with State's Attorney James Thomas ("Thomas") on

November 12, 1997, leaving his pager and home number with a message to call Kenary.

(Exhibit K).

72. Hasdasz was assigned by Flaherty to assist the DEA and the State's Attorney's office to

investigate Russo. (Hajdasz Dep. at 64.)

73. Kenary and Hasdasz of the HPD were assigned to the investigation of Russo. (Flaherty

Dep. at 132.)

74. Flaherty supervised Hasdasz and Kenary in their investigation of Russo. (Flaherty Dep.

-12-

at 136.)

75.   State's Attorney Investigator Lawrence Skinner ("Skinner") made notes regarding the

investigation of Russo dated from September 24, 1997. (Exhibit L).

76.   Kenary was a HPD Lieutenant in 1997 under the supervision of Flaherty. (Flaherty Dep.

at 139.)

77.   Flaherty did not keep records of the Russo investigation that he was involved in.

(Flaherty Dep. at 151.)

78.   Even though Flaherty was involved and supervised the investigation of Russo, Flaherty

did not know of any evidence against Russo when he started the investigation as he

stated:

"Q    To start the investigation of Nick Russo, what evidence was there?
A     I don't know.
Q     There was none; right?
MR. HOWARD:  Objection.
A     I don't know.
Q.    You don't even know how that investigation started, do you?
A     No." (Flaherty Dep. at 217.)

## VI.   THE INVESTIGATION OF RUSSO

79.   Diversionary Inspector of the Drug Enforcement Agency Marcus Brown ("Brown") was

involved in the Russo investigation and authored an investigatory report. (Croughwell

Dep. at 112; Exhibit N.)

80.   Kenary and Hazdas were the investigators for the HPD regarding the allegations against

Russo. (Croughwell Dep. at 116.)

81.   In the fall of 1997, Croughwell assigned Kenary to investigate Russo, after Croughwell

had met with James Thomas about Russo. (Croughwell Dep. at 116.)

82.    Croughwell and Thomas discussed Russo and an investigation into Russo in November, 1997. (Croughwell Dep. at 116.)

83.    Croughwell asked James Thomas to investigate Russo and to be in charge of the JIT. (Croughwell Dep. at 117, 122.)

84.    Flaherty told Croughwell that Russo had been prescribed 5,000 pills. (Croughwell Dep. at 119.)

85.    Croughwell asked the State's Attorney's office to investigate Russo but did not ask the State's Attorney's office to investigate Lawlor for allegations of perjury. (Croughwell Dep. at 117-119.)

86.    On approximately, January1997, Kenary talked to Drug Enforcement Agency (D.E.A.) agents Frank DeCarlo ("DeCarlo") and Kurt Reid ("Reid")who gave Kenary the name of Marcus Brown, a Diversionary Inspector of the D.E.A., and told Kenary that they will have Brown call him. (Kenary Dep. at 134-135); (Croughwell Dep. at 190).

87.    Kenary was angry at Russo for his involvement with the Fed. Gang Task Force. (Lawlor Dep. at  203.)

88.    Early in October 1997, Kenary runs into Reid and DeCarlo again at a bar at the airport. They ask him if Brown had ever called him. Kenary tells them "no". (Kenary Dep. at 138-140.)

89.    One week later in October 1997, Kenary calls Brown to set up a meeting. (This was stated in the search warrant affidavit, however, Kenary stated in his deposition that Brown called him.) (Kenary Dep. at 138-140.)

90.     As part of this investigation, Brown entered pharmacies in Russo's neighborhood and around the vicinity of Dr. Santo Buccheri's office demanding Russo's patient profile and prescriptions; no other patient profiles were gathered. Brown was not conducting routine administrative inspections, but instead was aiding the HPD in their criminal investigation into Russo, which both Brown and the state admit to. (Exhibit Q - November 14, 1997 Affidavit and Application for Search and Seizure Warrant for Dr. Buccheri's office.)

91.     On November 13, 1997, Brown and Skinner went to Dr. Buccheri's office without a warrant and obtained information from searching Russo's medical file in Dr. Buccheri's office. (Brown Dep., <u>Rivera v. Bailey,</u> at 47-51; Buccheri Dep., 5/16/0, <u>Rivera v. Bailey,</u> at 78-81; 94-99.)

92.     Brown and Skinner drafted a search warrant with the information he had obtained through searching Russo's medical file at Dr. Buccheri's file. (Brown Dep. at .47, 48, 51, 91, 92.)

93.     Brown used the information obtained at Dr. Buccheri's office on November 13, 1997, to draft the search warrant dated November 14, 1997. (Brown Dep. at .91-96; Exhibit Q.)

94.     Brown identified himself to Buccheri as an Agent, which is a police official. (Exhibit Q.)

95.     On November 14, 1997, Brown seized 20 pages of Russo's prescription records from Dr. Buccheri's office. (Brown Dep. at 69.)

96.     Brown did not have a warrant to obtain the medical file from Dr. Buccheri's office, but Brown looked through and seized the entire original medical file. (Brown Dep. at 45-48,

70, 71, 74, 94-96.)

97.     When Brown and Skinner went to Bucchieri's office on November 17, 1997, they asked
for Russo's medical records. (Bucchieri Dep., 5/16/01, at 53.)

98.     Bucchieri was subsequently questioned by Brown and Skinner without a warrant.
(Brown Dep. at 82-83.)

99.     Dr. Bucchieri provided Brown and Skinner with the names of pharmacies in which
Russo had prescriptions as well as the medical file. (Bucchieri Dep., 5/16/01, at 132-
134.)

100.    When Bucchieri was questioned at the State's Attorney's office, accompanied by his
attorney Ed Daly, Bucchieri was allowed to refuse to answer questions. (Hajdasz Dep. at
266.)

101.    Beginning on October 31, 1997, Brown went to pharmacies located in the vicinity of
both Buccheri's office and the defendant's home and, without a search warrant, asked
each of the pharmacies to provide him with the defendant's prescription records.[1]
(Exhibit Z at 15-24.)

102.    The records contained information about prescriptions that each pharmacy had filled for
the defendant, including the name of the prescribing physician, the date on which the
defendant had submitted the prescription to the pharmacy, the type and quantity of drug
prescribed and the price of the drug. (Exhibit Z at 15-24.)

103.    The pharmacies complied with Brown's requests. Brown later returned to each

---

[1] Facts contained in Exhibit Z were found by Judge Schimelman in his ruling following a
hearing on Russo's Motion to Suppress that included testimony from Marcus Brown.

pharmacy and, again by request, obtained copies of the actual prescription forms that the defendant had presented to the pharmacies. (Exhibit Z at 15-24, 15-25.)

104. The Connecticut Superior Court, The Honorable Judge Schimelman found, following a hearing on a Motion to Suppress, that Russo was the focus of the investigation by Brown and Kenary not an investigation of Bucchieri. (Exhibit Z at 15-25, 15-26, 15-27.)

105. A report prepared by Brown on November 19, 1997, identifies Russo as the target of Brown's investigation. (Exhibit Z at 15-26.)

106. Prior to preparing the November 19, 1997 report, Brown had not requested records of Buccheri's prescribing practices but, instead, had requested only Russo's records. (Exhibit Z at 15-27.)

107. Judge Schimelman found that the purpose of Brown's investigation was to determine whether Russo had been abusing controlled substances, and that Buccheri was involved only because he was Russo's physician. (Exhibit Z at 15-27.)

108. Judge Schimelman found that Brown was not conducting an administrative inspection of the pharmacy pursuant to 21 U.S.C. §§ 880 when he obtained the defendant's prescription records but, rather, was acting in pursuance of a criminal investigation of the defendant in cooperation with the HPD. (Exhibit Z at 15-32.)

109. Brown's investigation into Detective Russo's private prescriptions involved his going to the previously mentioned pharmacies and demanding to see Detective Russo's patient profile and, upon returning to the pharmacies, demanding Detective Russo's actual prescriptions, which he took into custody. (Exhibit Z at 15-24, 15-25, 15-27.)

110. Agent Brown took these actions without seeking a criminal or even an administrative

-17-

search warrant. (Exhibit Z at 15-24.)

111. Kenary's investigated Russo's confidential medical records.  (Lilley Dep. at 117-124, 129-144, 149-152; Kenary Dep. at 77-80, 85-92, 97-128, 133-152; Casati Dep. at 153-156, 169-172, 181-184; Croughwell Dep. at 137-156, 169-200, 249-256.)

112. In January 1997 Lilley, Kenary, Casati, and Croughwell, all of the HPD, contacted Dr. Buccheri and questioned him about his treatment of Russo, and discussed illegal disclosures of Russo's medical treatment; specifically, information pertaining to certain drugs which the doctor was both giving and prescribing to Russo.  (Lilley Dep. at 117-124, 129-144, 149-152; Kenary Dep. at 77-80, 85-92, 97-128, 133-152; Casati Dep. at 153-156, 169-172, 181-184; Croughwell Dep. at 137-156, 169-200, 249-256).

113. Kenary contacted the DEA in January, 1997, and spoke with DeCarlo and Reid who referred Kenary to Marcus Brown, a Diversionary Inspector of the Drug Enforcement Agency (DEA).  (Kenary Dep. at 134-135.)

114. Kenary testified that he again "ran" into DeCarlo and Reid at a "bar" in October, 1997 and that they offered to have Mr. Brown contact him.  (Kenary Dep. at 138-140.)

## VII. RUSSO WAS INTENTIONALLY TREATED DIFFERENTLY FROM OTHERS SIMILARLY SITUATED.

### A. Russo Placed On AWOL Status.

115. On January 7, 1997, Russo called in sick to Roberts.  Roberts recorded the voice messages and gave the recordings to Kenary in the presence of Croughwell and Casati. (Kenary Dep., Rivera v. Bailey, at. 125, 126; Exhibit 28).

116. The next day a meeting was held regarding the voicemail tape of Russo's sick call.

Present at the meeting were: Casati, Croughwell, Kenary, Ward, Roberts, and Doctors

Braunsford and McCants (E.A.P.). (Russo Dep, 6/24/03, at 147-48.)

117.    On approximately, January 10, 1997, Russo submitted a doctor's note (dated January

10, 1997) indicating he was under Dr. Buccheri's care from January 7th through

January13th, for influenza, with Union President Dennis O'Brien as a witness and that

Russo could return to work on January 13, 1997. (Kenary Dep., Rivera v. Bailey, at

100.)

118.    Kenary thought the note was suspicious and looked like female handwriting. (Kenary

Dep., Rivera v. Bailey, at 101.)

119.    Lilley then contacted Dr. Buccheri regarding Russo's absence and Dr. Buccheri's note.

(Lilley Dep. at 117, 118, 123).

120.    It is disputed as to who initiated the phone call to Dr. Buccheri: Kenary testified that on

January 10, 1997 (12:50 p.m.), Kenary initiated a call to Dr. Buccheri regarding the

Doctor's note. In a memo to Casati dated January 10, 1997, Kenary stated that Lilley

made the initial call to Dr. Buccheri. Lilley testified that he called Dr. Buccheri first.

(Kenary Dep., Rivera v. Bailey, at 110-112; Exhibit T; Lilley Dep. at 117, 118, 123.)

121.    On approximately, January 10, 1997, Dr. Buccheri confirmed on a telephone call with

Kenary and in a faxed letter that Russo had treated with Dr. Buccheri and that he had

treated Russo on January 7th through January11th for "unofficial" visits.(Kenary Dep.,

Rivera v. Bailey, at 117-122; Lilley Dep. at 117-124, 129-144, 149-152; Kenary Dep. at

77-80, 85-92, 97-128, 133-152; Casati Dep. at 153-156, 169-172, 1,81-184; Croughwell

Dep. at 137-156, 169-200, 249-256).

122.    On approximately, January 9, 1997, Russo was marked AWOL by Roberts which is in violation of General Order 8-1, which provides the procedures for reporting sick, which Russo followed, in that Russo called Roberts out sick in accordance with the procedures. (Exhibit J.)

123.    Roberts did not receive training as a Supervisor on how to identify physical signs of intoxication or drug abuse.:

" A.  Yes.  That came in traffic training when I was a DUI officer, driving while intoxicated."(Roberts Dep. at 125.)

124.    Roberts testified that:

"Q.  If someone calls you up and says, "I know I'm supposed to be working today, but I'm taking a medication that makes me drowsy, I would like to book off sick," you would let them off.  Right?
A.   Yes.  If they said that, yes."  (Roberts Dep. at 135.)

125.    Despite the doctor's note, Kenary placed Russo on AWOL status. (Kenary Dep., <u>Rivera v. Bailey</u>, at 103.)

**B.    <u>Russo Ordered to Report Everyday to HPD / OT Denied.</u>.**

126.    Kenary testified that Casati ordered Kenary to order Russo to check in with the HPD everyday. (Kenary Dep., <u>Rivera v. Bailey</u>, at 115.)

127.    No other officer was required to report and submit a daily itinerary. (Croughwell Dep. at 211.)

128.    After Russo's partner, John Murdock, ("Murdock") was assaulted by his supervisor, Anthony Cancel ("Cancel") and retired in 1996, Russo was not given a replacement partner even though every other detective had a partner. (Roberts Dep. at 211.)

C.    **Russo Intentionally Locked Out of the CAPers Office.**

129.    In the Spring of 1997, the locks to the CAPers office were changed and no key was given to Russo. (Kenary Dep., Rivera v. Bailey, at 128.)

130.    Roberts does not remember if he told Russo that he could not have a key to the CAPers office. (Roberts Dep. at 76.)

131.    The work atmosphere toward Russo in 1997 was hostile.  He was "locked out, locked out of his own office, basically, which thereby prevents you from doing research on open cases." (Huertas Dep. at 51-52.)

132.    Roberts does not dispute that he told Russo that Russo had to come to CAPers to close out some paperwork but that he would not receive any overtime to do so. (Roberts Dep. at 96-97.)

133.    In April 1997, Roberts told Russo that he had changed the locks to CAPers and that he did not change the locks to CAPers, that Casati or Kenary changed the locks. Specifically Roberts testified that:.

"Q.  Did you tell him on that date that you changed the locks on the doors to CAPers?
A.  I may have.
Q.  Do you have a recollection or is it no?
A.  I recollect having a conversation about the locks.
Q.  You did change the locks on the doors around that time.  Right?
A.  I didn't change them.  We had them changed.
Q.  Were you responsible for having them changed or who made the decision?
A.  Casati.  He was the Deputy Chief of the division.
Q.  Who initiated the lock change; do you know?
A.  I'm not sure.
Q.  Was it Kenary?
A.  It may have been.  I don't know." ( Roberts Dep. at 97-98.)

134.    Roberts did not give Russo a key to CAPers although he spoke to Russo about changing

-21-

the locks. (Roberts Dep. at 100.)

135.  Roberts knew that Russo did not have a key .( Roberts Dep. at 105.)

**D.    Disparate Treatment**

136.  Croughwell asked the State's Attorney's office to investigate Russo but did not ask the

State's Attorney's office to investigate the allegations of perjury against Lawlor.

(Croughwell Dep. at 117-119.)

137.  There is not a policy or prior practice of the HPD having the State's Attorneys Office

investigate a police officer prior to Russo but Croughwell had the State Attorney's

office investigate Russo. (Flaherty Dep. at 32.)

138.  The City does not  provide for suspension with pay but Russo received pay while

suspended. (Croughwell Dep. at 110; Exhibit 21.)

139.  In a memorandum dated November 4, 1997, Flaherty ordered Russo to go on sick leave.

(Exhibit 5.)

140.  In a memorandum, from Huertas to Russo, dated April 2, 1997, Russo is informed that

he was not entitled to receive over time pay. (Exhibit 6.)

141.  The overtime log dated March 29, 1997, shows that every other officer assigned to the

CAPers division received overtime pay and Russo was not given such pay.  (Exhibit 7.)

142.  Russo complained to Kenary that he was given an excessive workload and he was not

provided with any assistance from other officers.  (Exhibit 21.)

143.  Russo requested a partner for assistance. (Exhibit 22.)

144.  The HPD had not investigated anyone, either officer or general public, for prescription

drug fraud except Russo. (Hajdasz Dep. at 175.)