145.   Russo was the only officer Croughwell ordered on sick leave following a drug test.
        (Flaherty Dep. at 100-101.)

146.   Russo is the only officer who had his weapon taken away during a drug test. (Flaherty
        Dep. at 102-104.)

147.   Miele sexually assaulted a prostitute in New Britain, Connecticut and was not
        investigated or arrested or disciplined. Russo was investigated and arrested.  (Russo
        Dep. 6/25/03, at 214-221.)

148.   Assistant Chief McKoy ("McKoy") was found by New Britain Police soliciting a
        prostitute.  This incident was known by the HPD but was not investigated and Chief
        McKoy was not arrested. Russo was investigated and arrested. (Russo Dep. 6/25/03, at
        77-92.)

149.   It is a crime to receive compensation from the City of Hartford through fraudulent
        means. (Hajdasz Dep. at 156.)

150.   Unofficial compensation time is not recognized by the HPD. (Flaherty Dep. at 210-11;
        Hajdasz Dep. at 154)

151.    Sergeant James Rovella ("Rovella") falsified and forged time cards in order to steal
        overtime from the HPD.  Even though the HPD does not recognize "unofficial
        compensation time" Rovella claimed that it was unofficial compensation time.  These
        actions could have been investigated, and Rovella could have been arrested; however,
        he was not.  Russo was investigated and arrested.  (Rovella Dep. at 34-63; Flaherty Dep.
        at 210-11; Hajdasz Dep. at 160.)

152.   Lawlor stalked, followed and threatened Russo. He was not investigated or arrested for

-23-

this. (Exhibit 32.)

153.   Croughwell threatened Russo over the telephone and told him Lawlor and Lyons would

beat him up stating, "I've got two guys here who want to kick your ass." Croughwell

was not investigated or arrested for this.  Nicholas Russo was investigated and arrested.

(Croughwell Dep. at 191-199.)

154.   Lyons threatened to beat up Russo for his involvement  with the Federal corruption

investigation.  He was not investigated or arrested for this.  Russo was investigated and

arrested. (Croughwell Dep. at 191-199.)

155.   Lyons was in possession of drugs and drug paraphernalia, 125 bags of heroin and 25

bags of crack cocaine and was not arrested. Russo was investigated and arrested. (Miele

Dep. at 78-108; Calderone Dep. at 135-148;  Russo Dep. 6/25/03, at 214-221; Kenary

Dep. at 153-160; Lawlor Dep. at 56-84; Croughwell Dep. at 229-240; Lyons Dep. at

181-203.)

156.   Acting Chief Robert Rudewicz ("Rudewicz") drove his vehicle into the Gold Building

in Hartford and was found in possession of cocaine in his vehicle. He was not

investigated or arrested. Russo was investigated and arrested.  In May, 2003, Rudewicz

was found intoxicated in his vehicle in Goodwin Park in Hartford at 2:00 a.m.  He was

not investigated or arrested. (Russo Dep. at 77-92.)

157.   Officer Eric Coleman ("Coleman") was found possessing cocaine and tested positive for

possessing cocaine.  Coleman was not disciplined or arrested and was allowed to resign.

Russo was not allowed to resign, but was investigated and arrested. (Russo Dep. at 77-

92.)

-24-

158. Croughwell promoted Sergeant Cancel to Lieutenant after he assaulted a subordinate with a gun. (Croughwell Dep. at 172.)

159. Cancel was suspended for a few days and the suspension ran concurrently with his scheduled days off after assaulting a subordinate. (Croughwell Dep. at 172.)

160. Sergeant Scott Vinci and Sergeant Michael Fallon were accused of stealing overtime and wages and were subsequently promoted to Lieutenant. (Croughwell Dep. at 243-44.)

161. Edelwich and Miele were in possession of drugs and drug paraphernalia, 125 bags of heroin and 25 bags of crack cocaine and were not arrested, an internal affairs investigation was not done, and neither were suspended and neither were forced to take a reasonable suspicion drug test . Russo was investigated and arrested. (Miele Dep. at 78-108; Calderone Dep. at 135-148; Russo Dep. 6/23/03, at 214-221; Kenary Dep. at 153-160; Croughwell Dep. at 229-240; Lawlor Dep. at 56-84; Lyons Dep. at 181-203.).

162. The HPD did not internally investigate Miele, Edelwich or Lawlor for the drug possession. (Miele Dep. at 131; Huertas Dep. at 116.)

163. After the drugs and other contraband were discovered in the Intelligence Unit, no officers assigned to the Intelligence Division were given a drug test, either random or a reasonable suspicion drug test. (Lawlor Dep. at 5.)

**E.    There Is No Rational Basis for the Difference in Treatment and the Defendants' Conduct Was Irrational and Wholly Arbitrary.**

163. It was improper for Roberts to deny Russo access to the CAPers office by denying him a key after the locks were changed. (Roberts Dep. at 102.)

164. A supervisor does not have the authority to prevent an officer from earning overtime if the officer has worked the overtime hours. (Roberts Dep. at 79, 80.)

165. Flaherty ordered Huertas not to give Russo any overtime in April, 1997, which is not allowed by the collective bargaining agreement. (Huertas Dep. at 50-51.)

## VIII.  SUBSTANTIVE DUE PROCESS CLAUSE AS TO THE POLICE DEFENDANTS.

### A.    Defendants Actions Were Arbitrary, or Conscience Shocking.

166. **On October 31, 1997,** Russo was threatened with bodily harm by Croughwell for his involvement with a federal corruption probe of the HPD, specifically, Lyons, Lawlor, Edelwich and Miele. (Plaintiff's 56(a)(2) Statement ¶ 152-55, 172-82; Russo Dep., 6/24/03, at 110, 115, 133; Edelwich Dep. at. 90-91; Croughwell Dep. at 133-34, 158, 188; Lawlor Dep. at 117, 119, 133, 139, 155, 159-160; Lyons Dep, at 128-130, 142, 145, 146, 154.)

167. Croughwell, in response to Russo's cooperation with the federal government, and the threat that posed to the police department, then conspired with Flaherty and Kenary, to illegally arrest and detain Detective Russo under the pretext of a required drug evaluation. (Plaintiff's 56(a)(2) Statement §§ I-IX.)

168. Between the time that Brown's investigation showed that Russo had obtained 5,000 pills of Tylenol 3 and Russo's arrest, none of Russo's supervisors, including Croughwell, Kenary, Flaherty or Roberts did anything to ensure that Russo was receiving counseling or treatment or that his health was not in jeopardy except to ask for a doctor's note and to give him a drug test. (Croughwell Dep. at. 256-7.)

-26-

IX.   **INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS AS TO CROUGHWELL, LYONS AND LAWLOR, MARQUIS**

   A.   <u>The Defendant Intended or Should Have Known That Emotional Distress Was a Likely Result of Their Conduct/ The Defendants Conduct Was Extreme and Outrageous.</u>

169.   **On October 31, 1997,** Russo was threatened with bodily harm by Croughwell. (Dep., 6/24/03, at 110, 115, 133; Edelwich Dep. at. 90-91; Croughwell Dep. at 133-34, 158, 188; Lawlor Dep. at 117, 119, 133, 139, 155, 159-160; Lyons Dep. at 128-130, 142, 145, 146, 154.)

170.   On October 13, 1997, Russo met with Kumnick at a soccer game. Russo discussed the federal corruption probe of the HPD that Russo was to be involved in. (Russo Dep., 6/24/03 at 52-56, 115-116); Croughwell Dep. at 148, 194-195.)

171.   On October 31, 1997, Rovella told Lawlor that Lyons, Lawlor and Edelwich were under investigation by the Federal Government for corruption and that Kumnick had told him such information after speaking with Russo. (Lawlor Dep. at 116, 117, 139; Edelwich Dep. at 59; Russo Dep., 7/2/02, at 50-51.)

172.   Lawlor told Croughwell something to the effect that "he got a call I believe it was from Kumnick stating that Russo and Kumnick had a conversation at a soccer match that their children were in. Russo told Kumnick . . . . that the FBI was going to be doing an investigation of corruption in the police department, to include Lawlor and Edelwich and some bosses." (Croughwell Dep. at 148, 136.)

173.   That same day, Lawlor, Lyons and Edelwich went to Croughwell's office to tell Croughwell about the conversation with Rovella. The meeting between Lawlor, Lyons,

-27-

Edelwich and Croughwell in Croughwell's office centered around the "alleged set of comments that Nick had made to [Rovella]", specifically that Russo was assisting the Federal Government with a corruption probe of HPD officers. (Lawlor Dep. at 114, 119, 155.)

174.    Croughwell could have but did not contact anyone from the Federal Government to confirm that there was an investigation of corruption against HPD officers. (Croughwell Dep. at 191-192.)

175.    Croughwell telephoned and paged Russo while Lyons, Lawlor and Edelwich were in his office on October 31, 1997. (Lawlor Dep. at 133, 139; Croughwell Dep. at 133, 134, 158.)

176.    During the telephone conversation with Russo on October 31, 1997, Detectives Lawlor, Lyons and Edelwich were in Croughwell's office and were very upset with Russo. (Croughwell Dep. at 147, 148; Edelwich Dep. at 87.)

177.    Edelwich was angry at Russo because Edelwich found out that he was a target in an investigation of corruption. (Edelwich Dep. at 84.)

178.    During the conversation Croughwell threatened Russo and stated that he had "three guys here who want to kick your fucking ass" (Russo Dep.,7/2/02, at 228-231.)

179.    In regard to this conversation Edelwich testified:

"Q    Were you there when Chief Croughwell called Russo
A    I think so, yes.
Q    What did he say to Russo
A    He asked him what's going on.  "I have these three guys in my office."
(Edelwich Dep. at 90.)
                                    * * * * * *
"Q    Did you hear what Chief Croughwell said to Russo when he called that day

-28-

A  He did say that These three guys are in my office and they want to know what's going on.  Something to that sort.  I don't remember verbatim." (Edelwich Dep. at  91.)

180.  Lyons is aggressive. (Huertas Dep. at 21.)

181.  Croughwell testified that the incident where Lyons, Lawlor and Edelwich threatened

Russo in Croughwell's office occurred before Croughwell asked James Thomas to

investigate Russo for prescription fraud. (Croughwell Dep. at 188.)

**B.    The Conduct Caused Plaintiff Severe Emotional Distress.**

182.  In approximately, March 1997,  Russo began seeing a psychologist, Dr. Hall.  (Russo

Dep., 6/24/03, at 155.)

183.   Russo then saw Dr. Hall, from December 1997 through the present.  (Russo  Dep.,

6/25/03, at 96.)

184.  On approximately December 29, 1997,  Russo entered the Institute of the Living. (Russo

Dep., 6/25/03, at 97-99, 110.)

185.  In 1998, Russo began seeing Dr. Goodwin, a psychiatrist. (Russo Affidavit.)

186.  On July 11, 2002,  Russo was taken to hospital by ambulance, inpatient overnight, mid-

way through the deposition. (Russo Affidavit.)

**X.    THE CITY**

187.  Around April or May 2002, Russo is ordered to report to Manchester Police Department

to take part in an interview/meeting, at this meeting Lieutenant Neil Drife, Sergeant Ed

Pawlina  were to be present, concerning an internal matter. (Implied in letter that it was

not safe to go to HPD, they sent him to Manchester) A failure to appear by Russo would

warrant charges under the Code of Conduct. Russo was unpaid at this time.  (Exhibit

-29-

14.)

188.   Even though the criminal case was transferred to New London in October, 1998, the

HPD was still investigating and meetings were still held in the State's Attorney's office

in Hartford. (Hajdasz Dep. at 273.)

189.   In August, 2000 , the Connecticut Superior Court granted Russo's Motion to Suppress

the evidence against him for violations of the Fourth Amendment and dismissed the

criminal case against Russo. (Exhibit Z .)

190.   In October, 2000, following the dismissal of the criminal case against him,  Russo was

reinstated as a Detective with the HPD with benefits.  (Russo Dep., 6/25/03, at 170.)

191.   Dr. Hall sent a letter to the HPD saying that it is a hostile work environment Russo

cannot work in such circumstances. (Exhibit 20.)

192.   On July 17, 1997, Russo was transferred to the Federal Gang Task Force. (Exhibit 8.)

193.   On September 18, 1997, Russo was transferred to the Federal Gang Task Force.

(Exhibit 9.)

194.   On October 29, 1997, Russo was disciplined for being AWOL in January, 1997.

(Exhibit 10.)

195.   On December 3, 1997, Russo was transferred from the Federal Gang Task Force to

Fraud Unit. (Exhibit 11.)

196.   On October 27, 2000, Russo was reinstated  from being suspended. (Exhibit 13.)

197.   Russo was listed as "suspended" while he was out sick. (Exhibit 15.)

198.   Russo was charged AWOL on January 11, 1997, as certified by Roberts. (Exhibit 16.)

199.   In October, 2000, in response to the plaintiff's protective order, the court, Judge Hall,

gave an oral decision as to what conditions Hartford Police must meet for Russo's

return to work. Judge Hall ordered City of Hartford to provide a plan for Russo to

return to work safely. The City of Hartford fails to provide Russo with a supervisor,

prior to his return, to ensure his safety in the force.

200.   In November, 2000, Russo was issued a lump-sum paycheck. In a letter from the city,

he was told that it was back-pay earned up until the time of his dismissal, and that he

would begin to receive a weekly check.. (Russo Dep., 6/25/03, at 171-72.)

201.   From November, 2000 through February, 2001, Russo's benefits are reinstated and he

receives checks for 40 hours-per-week work. The checks did not state that the

payments were for accrued time. (Plaintiff's Affidavit, ¶ 9.)

202.   Russo requested to be returned to work in a safe environment to Chief Marquis on April

12, 2001. (Exhibit 29; Exhibit 30.)

203.   City never offered to get certification from state troopers rather than in-house in

Hartford or from another city for his safety. Rudewicz waited until the training elapsed

before reinstating Russo. Rudewicz Dep. at 169. Past practice was to allow officers to

train in other locations than Hartford. (Plaintiff's Affidavit, ¶ 8.)

204.   In November 27, 2000, Lawlor or Lieutenant Kornbrath ("Kornbrath") stalked and

followed Russo in a car, this incident was not properly investigated and the

investigation was not conducted by an impartial investigator. Marquis failed to "take

appropriate investigatory, supervisory and, or, disciplinary action against City of

Hartford supervisors with regard to the negligent, reckless, malicious, deliberate,

indifferent, willful, intentional and unlawful conduct complained of.". (Russo Dep.,

-31-

6/25/03, at 178-79, 183;  Lawlor Dep., at 106-07; Exhibit 32.)

205.    On February 19, 2002, the Supreme Court of Connecticut overrules the Superior Court's

granting of Russo's Motion to Suppress and remands the case for trial.  (Russo

Affidavit.)

206.    On February 19, 2002 , Russo filed a Motion to reconsider en banc and filed a Motion

to Recuse Judge Palmer which was denied.  (Russo Affidavit.)

207.    Justice Richard Palmer stated in a signed ORDER: " I have no personal relationship

with Lt. Kenary, and have never had one. . . . although it is possible that I may have met

Lt. Kenary in my official capacity as United States Attorney or Chief State's Attorney

between 1980 and 1993, I do not recall any such meeting." (Exhibit X.)

208.    Kenary and Justice Palmer did have a social relationship:

"Q    Did you know of any relationship between Lieutenant Kenary and Richard
Palmer?  Did you ever hear about anything like that?
MR. GOUMAS: Object to the form.
A    I think I witnessed -- I might have seen them like socially, that type of thing.
Q    Palmer and Kenary?
A    Yeah.
Q    Do you know where you saw them socially?
A    The local watering hole, Arch Street Tavern.
Q    Oh, the Arch Street.  Right down the street from the federal building in Hartford?
A    You could say that, yeah.
Q    Lot of judges go there?
MR. GOUMAS: Objection to the form.
MR. SHEA:   Objection to the form.
A    I've seen at least one there.
Q    Okay.  Me too.  So you saw Palmer and Kenary in the Arch Street together?
A    I think one time, yeah." (Huertas Dep. at 89.)

209.    On October 14, 2003, the criminal trial begins. (Plaintiff's affidavit.)

210.    On November 3, 2003, Russo was convicted on six counts out of seven counts of

-32-

illegally obtaining prescription drugs.  (Plaintiff's affidavit.)

211.    On January 6, 2003, Russo is sentenced and was given probation. (Plaintiff's affidavit.)

212.    On December 7, 2001, Russo has open heart surgery, and the City provides him with

health coverage for the surgery.   (Russo Dep., 6/25/03, at 19.)

213.    On January, 2002, Russo filed for worker's compensation.  (Plaintiff's affidavit.)

214.    The City contested the benefits.

215.    On July 12, 2002, two days following Russo's deposition he was notified that health

benefits were discontinued as of June 30, 2002. (Plaintiff's affidavit.)

216.    On June 30, 2003, John Shea appeared at the Workman's Compensation hearings and

assisting Workman's Compensation attorneys without an appearance. (Exhibit 36, at 61-

67.)

217.    In January 2004, the Worker's Compensation Commissioner rules in favor of Russo and

awards him worker's compensation benefits after a three day hearing. (Plaintiff's

Affidavit.)

218.    The City appealed the commissioner's decision and filed a Motion to Correct the

decision which was "Denied in Its Entirety". (Exhibit O).

219.    Russo was listed as "Suspended" from December 15, 1997 through November 2000.

On November 11, 2000, Russo is listed as "AWOP".  Russo is listed as "AWOL" and

"AWOP" alternately between November, 2000 through May 30, 2002.  In July 2002,

Russo is listed as "Suspended". Neither "AWOP" nor "AWOL" are recognized

categories for absent employees by the Union or HPD.  (Exhibit Y; Testimony of Frank

Szilagy, Exhibit 36 at 19-29.)

-33-

220.   On November 1, 2000, the Personnel Department did not require Russo with any

conditions to return to work other than to present a fit for duty release and to meet

certification requirements. (Exhibit 19.)

221.   Dr. Mark Hall provided treatment to Russo since 1997 and repeatedly said that while

Russo was fit for duty but that the HPD provided a hostile work environment to which

he could not return.  (Exhibit 20.)

## XI.    BREACH OF DUTY OF FAIR REPRESENTATION AS TO UNION

### A.    The Union Acted Arbitrarily, Discriminatorily or in Bad Faith

222.   On January 26, 1999, Larry Reynolds  corresponded with Attorney Brewer regarding

Russo's grievances thus indicating that he was aware of all of the issues involving

Russo. (Exhibit 17.)

223.   Reynolds was informed by Brewer that the union was to represent Russo.  (Exhibit 18.)

### B.    The Union's Acted Fraudulently or Deceitfully Plaintiff's 56(c)(2) Statement

¶ 230.

### C.    The Union Did Not Act to Further the Best Interests of its Members.

Plaintiff's 56(c)(2) Statement ¶ 230.

## XIII.   VIOLATION OF FOURTH AMENDMENT

### A.    Just Cause Drug Test

224.   Roberts based the just cause memo on the telephone calls with Russo and was only able

to make a determination by what he heard and was not able to identify any physical

signs of intoxication. (Roberts Dep. at 124-125.)

225.   Roberts did a just cause memorandum in January 1997 to drug test Russo which was

-34-

initiated by Roberts' personal observations. (Roberts Dep. at 116, lines 10-25.)

226.  The results of the just cause drug test must be given to the testee within 24 hours of the test and they were never given to Russo despite repeated requests to Croughwell from the Union and Russo.  (Russo Vol. II at 221-225; Roberts Dep. at 212.)

**B.    Reasonable Suspicion Drug Test**

227.  Croughwell ordered Flaherty to take Russo to the HPD and then to a drug test facility. The drug test was not done pursuant to the Drug Test Policy and Russo was taken in custody, had his gun taken away and was intimidated and threatened by Sergeants Hajdasz, Huertas, Lt. Flaherty, and was not allowed to leave the police car.  In violation of the Drug Testing Policy, Russo was not given the opportunity to refute the allegations against him.  The Drug Test was part of the criminal investigation that was initiated against him by Croughwell.  (Huertas Dep. at 79-85; Flaherty Dep. at 223; Croughwell Dep. at 172, 174.)

228.  Prior to forcing Russo to a drug test in the fall of 1997, Croughwell did not have knowledge that Russo had a drug or alcohol problem. (Croughwell Dep. at 176.)

229.  Flaherty took Russo's gun and never gave it back to him. Flaherty was not concerned about Russo's risk of hurting himself or others as evidenced by Flaherty's failure to pat down Russo for other weapons and following the drug test none of the supervisors or union or EAP members assisted Russo or provided him with any assistance, including an EAP referral. (Huertas Dep. at 105.)

230.  Lt. Flaherty, Srgt. Hasdazs and Srgt. Huertas, all who were on duty and armed, drove to New Haven and took Russo into custody for the drug test. Flaherty took away Russo's

-35-

gun and Russo drove Russo to the HPD and then to the Medtox facility. Larry Reynolds was also present and did not advocate on behalf of Russo during the ride. (Huertas Dep. at 79-85; Flaherty Dep. at 223.)

231.   Even as Russo was being drug tested, Flaherty did not know the reason for the drug test because he had not written the reasonable suspicion memorandum yet. (Flaherty Dep. at 223-224). Croughwell ordered the drug test before the reasonable suspicion memorandum was written. (Flaherty Dep. at 153.)

232.   After the drug test of Russo had occurred, Flaherty ordered Hasdasz to type the reasonable suspicion memorandum after Flaherty had drafted it.(Flaherty Dep. at 228-29);

233.   Flaherty was ordered by Croughwell to write down the reasons for the reasonable suspicion drug test but Flaherty had not observed any of the symptoms himself and did not know the reasons for the drug test. (Flaherty Dep. at 152-153.)

234.   Russo was too afraid to speak during the ride from New Haven to the HPD because he had a reasonable fear that he would be either pushed out of the car and Flaherty could blame it on Russo jumping out of the car. Plaintiff's affidavit, ¶ 10. After Russo was transported from New Haven to the HPD, Russo asked to use the bathroom and Flaherty did not allow Russo to leave the car. (Huertas Dep. at 98-99.)

235.   Captain Flaherty ordered Russo off sick after the drug test was administered which is in violation of General Orders 8-1 (Exhibit J), because sick time is provided only for illness, enforced quarantine or bodily injury, which Russo was not. (Exhibits J, K; Huertas Dep. at 103.)

236. Flaherty marked the type of drug test as "Random" on the MedTox form although it was not random and there was a box for Reasonable Suspicion. (Exhibit V.)

237. The Collective Bargaining Agreement (hereinafter "Contract") between the H.P. Union and the City of Hartford includes the Drug testing policy and employees rights. (Exhibit A.)

238. The Code of Conduct governs the conduct of Hartford police personnel. (Exhibit B.)

239. The Drug Testing Policy provides in Policy Section 2 Procedure 3 provides the Purpose, the Policy and Affected Employees provisions of the policy were violated by Roberts, Croughwell, Flaherty, Kenary and the City of Hartford in that: the Purpose of drug testing policy was to identify those employees with substance abuse problems and provide assistance to the employee, the policy was not to be used as a disciplinary method." (Exhibit C.)

240. Section VI, Confidentiality Section was violated when test administration and "will assure absolute confidentially of employees, no information should be furnished to anyone authorized to this policy, no procedures shall be in any personnel file except when records are part of a disciplinary action." (Exhibit C.)

241. The Drug Policy is set forth in General Order 8-34, effective January 10, 1994. (Exhibit D.)

242. The Method of Reasonable Cause is set forth in Section C of General Order 8-34,

-37-

provides: (2) " prior to the implementation the City shall be responsible for providing training to all supervisory personnel". . . Supervisory personnel who have received the mandated training for reasonable suspicion testing in relation to this policy and having a reasonable suspicion that an employee this training was not provided to Russo's supervisors. (Russo Vol. 1 at 91; Exhibit D.)

243. The Drug Testing Policy is not effective until terms of the Drug Testing Policy were met, including that all supervisory personnel were given testing. Russo's supervisors were not trained and the procedures were not met. (Exhibit A.)

244. Section 1 (1) of General Order 8-34 provides that the Drug Testing Policy is to be confidential, has non-punitive purpose and is not to be used for disciplinary purposes. (Exhibit D.)

245. The Last Chance Agreement allows the employee the ability to a 30 day suspension and EAP assistance was never offered to Russo by the City or Croughwell, Roberts, Kenary, Flaherty, Lilley, Lyons which is in violation of the Drug Testing Policy procedures. (Exhibit E.)

246. General Order 8-18, provides the procedures for the Employee Assistance Program (hereinafter "EAP") Section B provides that the EAP: "shall not be used to deprive an employee of collective bargaining or other rights . . . . The Program shall be administered so that an employee will not suffer any punishment, prejudice or jeopardy solely for participating in EAP. Russo was never offered assistance from the EAP even though he was subjected to two drug tests within eight (8) months. (Exhibit F.)

247. Flaherty testified that in fact the reasonable suspicion drug test occurred before he even

-38-

wrote the memo:

A   "[Croughwell] told me the reason for the drug test and to document it and have the
memo  on his desk the first thing in the morning.
Q   Because he already ordered the drug test before the memo was done; right? . . .
A   Yes.
Q   So Nick Russo was reasonably caused drug tested and then Joe Croughwell told
you
      what the reason would be after the fact? . . .
A   Yes.
Q   That's the scenario.  Even though you made no observations and you didn't ask for
a reasonable cause drug test for Russo, you wrote the memo?
A   Correct." (Flaherty Dep. at 153-4.)

## XIV.   CREDIBILITY ISSUE OF WITNESSES

248.    The testimony of Lawlor on page 17 of his deposition is in direct conflict with his

testimony on page 20.:

" Q     Were you ever accused of misstating facts  in a prosecution involving Assistant

      Prosecutor Assistant State's Attorney Taylor?
A   No."(Lawlor Dep. at 17).

            * * * * *

  "Q. Do you know who Jim Thomas is?
A. Yes.
Q.  Do you know if he ever complained to Chief Croughwell that you had misstated
facts in a criminal case involving -- that was brought by Assistant State's Attorney
Taylor?
A    No." (Lawlor Dep. at  17.)

            * * * * *

" Q     Okay.  Who was the prosecutor on the case that you improperly prepared for
court testimony?
A    Carl Taylor.
Q    Did he complain about your testimony to anyone?
MR. HOWARD:  Objection to the form of the question.
Q    Do you know if he complained about your testimony?

-39-

A    I believe so.
Q    Who did he complain to?
MR. HOWARD:  Objection to the form of the question.
MR. BREWER:  I'll rephrase it.
Q    Do you know who he complained to?
A    I believe Jim Thomas.
"Q    You're saying that Carl Taylor and Jim Thomas complained to Chief Croughwell
       about your testimony; right?
A    Yes." (Lawlor Dep. at   20)

249.    Lawlor has used excessive force and has shot at suspects. (Lawlor Dep. at 146-47.)

250.    Lawlor perjured himself while testifying in criminal trials.    (Durham Dep. at 47.)

251.    "Detective Lawlor was very active, an aggressive police officer.  And I think by

        reputation, I think Detective Lawlor's sort of nickname was Robocop." (Durham Dep. at

        61.)

252.    Kenary has lied to other officers. (Roberts Dep. at  204-205.)

253.    Rovella had an extra marital affair with Joan Alexander. Having an adulterous affair

        with a married Hartford police officer during work hours is considered conduct

        unbecoming and a violation of the code of conduct. (Lawlor Dep. at  171; Roberts Dep.

        at  69-70.)

254.    Complaints of excessive force had been made against Lyons and complaints had been

        made against Lawlor for not being prepared to testify in a criminal prosecution.

        (Croughwell Dep. at 64-66, 73.)

255.    Lyons and Lawlor beat and planted evidence on gang members during their tenure on

        the Hartford Police Crime Suppression Unit. (Croughwell Dep. at  77.)

256.    There was a internal affairs investigation conducted against Lawlor for perjury for

-40-

testimony during case with Assistant State's Attorney Carl Taylor. (Exhibit 1; Croughwell Dep. at 90.)

257. Roberts heard that Croughwell would come to work drunk and using painkillers and Roberts saw bottles of pain killers on Croughwell desk at work. (Roberts Dep. at 70.)

258. Stephen Miele did not tell his supervisors or US Attorneys that he worked with about his memory problem stemming from his traumatic brain injury. (Durham Dep. at 116.)

259. Lawlor was under investigation by Internal Affairs in 2000 for running a red light and harassing Russo.(Lawlor Dep. at 106.)

260. An Internal affairs investigation was conducted on Lyons for complaints of mistreatment made by citizens against Lyons, including intimidation and aggressive acts against citizens, which resulted in Lyons transfer. (Huertas Dep. at 18.)

261. Kline and Jim Glasser has a history of retaliation. Assistant Chief Hogan testified:

"Q. Were you retaliated against because you complained about Kline's investigative techniques?
A. I was threatened with arrest by the US attorney because I verbalized it to him.
Q. I don't want you to think I have ESP or anything, but did Jim Glasser have anything to do      with that?
A. Jim Glasser and his daddy, the judge from New York.
Q. Jim Glasser, the assistant U.S. attorney threatened you with arrest?
A. Yes." (Hogan Dep. at 25-26.)

262. Assistant Chief Hogan observed Croughwell intoxicated while on duty. (Hogan Dep. at 50-52.)

263. After Glasser threatened Assistant Chief Hogan with arrest Hogan was the victim of an attempted set up with a prostitute. (Hogan Dep. at 59-63.)

## XV.    SEARCH / WARRANT FOR RUSSO

-41-

264.   Between the drug test in January 1997 and Russo's arrest, Croughwell did not have any evidence that Russo was abusing drugs. (Croughwell Deposition, p. 255, lines 15-24.)

265.   Between the time that Brown's investigation showed that Russo had obtained 5,000 pills of Tylenol 3 and Russo's arrest, non of Russo's supervisors, including Croughwell, Kenary, Flaherty or Roberts did anything to ensure that Russo was receiving counseling or treatment or that his health was not in jeopardy except to ask for a doctor's note and to give him a drug test. (Croughwell Deposition, p. 256-7.)

266.   On approximately December 15, 1997,  Hajdasz met at the State's Attorney's office with Brown, Joan Alexander, and Hammick.  There they draft the warrant for Russo's arrest.  Thomas reviews the warrant and it was signed by the Judge.

267.   On approximately, December 15, 1997 , Kenary stated in a  memo to keep case/investigation open.

268.   On approximately, December 15, 1997, arrest warrant executed for Russo..

269.   Between the drug test in January 1997 and Russo's arrest, Croughwell did not have any evidence that Russo was abusing drugs.  (Croughwell Depo., p. 255, lines 15-24.)

270.   On approximately, December 16, 1997, a Search warrant executed for Russo's house for prescription pills, pill containers, and any unfilled prescriptions.  Search warrant claims that "nothing was seized".  However, Russo's son's medication was taken as well as some of Russo's police items (badge, etc.)

271.   On approximately, December 16, 1997 , Russo arrested by Hajdasz and Skinner, and charged with four counts of "Illegally Obtaining a Controlled  Substance" and four counts "Forgery in the Second Degree." (Russo Dep. Dated June 25, 2003, p.60, lines

-42-

24-2.)

272.    Russo was arrested at his home and was walked out in front of his neighbors to the

police car that was parked across the parking lot in order to embarrass him even though

there is no legitimate reason for extending the amount of distance someone has to walk

in handcuffs outside their residence. (Flaherty Deposition, p. 173, lines 1-5.)

273.    The City has a history of retaliating against individuals who speak out or make

complaints against Hartford officers. Stack v. City of Hartford, (jury found Sergeant

liable for retaliation against plaintiff who made complaint against HPD); Fago v. City of

Hartford, (City retaliated against plaintiff for testifying in court against officers).

THE PLAINTIFF,
NICHOLAS O. RUSSO, JR.


By:
James Brewer
Erin I. O'Neil
Brewer & O'Neil
818 Farmington Avenue
West Hartford, CT  06119
(860) 523-4055
Federal Bar # ct 23073

## CERTIFICATION

This is to certify that the foregoing has been faxed on March 19, 2004, to all counsel and pro se parties of record:

Charles L. Howard, Esq.
Gregg P. Goumas Esq.
Derek Mogck, Esq.
Shipman & Goodwin LLP
One American Row
Hartford, CT 06103-2819

John P. Shea, Jr.
Sabia & Hartley, LLC
190 Trumbull Street
Suite 202
Hartford, CT 06103-2205

Frank Szilagyi, Esq.
Silvester, Daly & Delaney
72 Russ Street
Hartford, CT 06106

Attorney Helen Apostolidis
Office of Corporation Counsel
City of Hartford
550 Main Street
Hartford, CT 06103

Erin I. O'Neil