UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

FILED
2004 MAR 19 P 2:33
U.S. DISTRICT COURT
BRIDGEPORT, CONN

| | |
|---|---|
| NICHOLAS O. RUSSO, JR., <br> PLAINTIFF, | CIVIL ACTION NO. <br> 3:00CV 2382 (JCH) |
| VS. | |
| BRUCE P. MARQUIS, CHIEF OF POLICE, <br> IN HIS INDIVIDUAL AND OFFICIAL; <br> AND THE CITY OF HARTFORD, <br> DEFENDANTS. | MARCH 19, 2004 |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO THE MOTION
FOR SUMMARY JUDGMENT BY DEFENDANT CITY OF HARTFORD**

Pursuant to Rule 56 of the of the Federal Rules of Civil Procedure, the plaintiff hereby objects to the motion for summary judgement on Count Seven filed by the defendant, City of Hartford ("City"), in the case of Russo v. Marquis, Docket No. 3:00CV2382 (JCH). This case is one of three cases brought by the plaintiff that has been consolidated for discovery purposes. The defendant is not entitled to summary judgment as a matter of law because the plaintiff has been successful in presenting genuine issues of material facts.

**I.    INTRODUCTION**

This action is brought by plaintiff against defendants, who acting under color of state and municipal law, charter, ordinance, regulation, custom or usage, have unlawfully violated plaintiff's civil rights to redress in this Court without retaliation, equal protection, and

1

substantive and procedural due process in violation of the First and Fourteenth Amendments to the United States Constitution. Plaintiff also brings this action against defendants for common law claim of intentional infliction of emotional distress.

## II.  STATEMENT OF FACTS

### A.  PRELIMINARY STATEMENT

The plaintiff, Nicholas O. Russo, Jr. (herinafter "Russo") was[1] a Detective with the Hartford Police Department Hartford Police Department (hereinafter "HPD") . Beginning in September, 1994 Russo was assigned to the HPD Crimes Against Persons Unit [presently referred to as "Major Crimes"] (hereinafter, "CAPERS"). In 1995, Russo was assigned to the Federal Violent Crimes Task Force, or Federal Gang Task Force. (hereinafter "FGTF"). Russo's investigative work for the HPD and the FGTF was outstanding and exemplary. Plaintiff's 56(c)(2) Statement ¶¶ 5-16.

There was tremendous animosity and conflict between HPD Detectives assigned to CAPERS and FBI Agents and HPD Detectives assigned to the FGTF. Plaintiff's 56(c)(2) Statement Section II.. The FGTF's quick resolution, and therefore, deprivation of HPD Capers personnel overtime, of homicides and Russo's cooperation with the federal Government became a contentious issue in the ranks of the HPD and the Connecticut State's Attorney Office. As a result, Detective Russo became the target of selective enforcement of departmental rules and regulations, illegal drug testing, false arrest and imprisonment, harassment, stalking and

---

[1] The plaintiff will be referred to as a former Hartford Police Detective although he has not been formally notified of his termination by the City of Hartford. He has, however been denied all pay, benefits and seniority since his arrest on December 16, 1997(except for a short period of time when the criminal charges were dismissed by the Superior Court). Therefore, plaintiff considers to have been discharged by the defendant City of Hartford.

derogatory comments and threats on his life.

Finally, in the fall of 1997 Russo became the subject of a vindictive criminal investigation, instigated by named defendants who wanted to ruin his credibility and career.

Russo's supervisors, including, Lieutenant Kenary, Captian Flaherty and Chief Croughwell were very bitter and then frightened about Russo's involvement with the Federal Government. Named defendants Croughwell, Lyons, Lawlor, and Flaherty believed Russo was providing incriminating information about corrupt acts they either committed, approved or covered up. On October 31, 1997, after learning from State Inspector Stephen Kumnick, Chief State's Attorney John Bailey and thereafter HPD Capers Detective Rovella that Russo was assisting in a criminal investigation into corruption at the HPD, Croughwell, Lawlor and Lyons, among others, threatened to, " kick [Russo's] fucking ass." Thereafter, Croughwell ordered Russo taken into Custody, his weapon taken, illegally drug tested and removed from duty. Croughwell also ordered Russo to submit to a lie detector test (polygraph) to determine the truthfulness of Russo's denial of involvement in the Federal Corruption investigation. Given the threats and refusing to compromise the federal investigation, Russo refused to admit his involvement to these criminals.

Concerned with the expansive knowledge and investigative ability of Russo, and their own criminal and unethical conduct, the defendants' set about on a course of action aimed solely at destroying Detective Russo's reputation, career and life. <u>Plaintiff's 56(c)(2) Statement Section II.</u>.

**B. THE POPE PARK MURDER, ILLEGAL DRUG TESTING, DISCLOSURE OF TESTING AND OTHER HARASSMENT**

On January 9, 1997, Russo's supervisor, Daryl Roberts improperly marked Russo

3

AWOL, after Russo called in sick, following the normal procedure and after providing Lt. Kenary and Sgt. Roberts with a note from his Physician.  Plaintiff's 56(c)(2) Statement VII(A). Plaintiff was subjected to hostile and disparate treatment by his superiors at the Hartford Police Department.  On January 9, 1997, Russo was subjected to an illegal drug test without reasonable cause or suspicion.  Plaintiff's 56(c)(2) Statement Section XIII(A).  Following the Pope Park Murder in July, 1997, Russo lead the criminal investigation for the FGTF which two days after the murder lead to the arrest, and later, conviction of the murderer Julio Ramos, the resentment of Russo dramatically increased. (Plaintiff's 56(c)(2) Statement Section II(A))

In 1997, Russo volunteered to assist U.S. Attorneys John Durham and James Glasser in a federal corruption investigation into the HPD. Plaintiff's 56(c)(2) Statement ¶ 61, 63, 68, 69. Russo's involvement with the federal corruption probe was leaked to the targets of the probe by State's Attorney Inspector Stephen Kumnick and then Chief State's Attorney John Bailey.  The targets of the federal investigation included the defendants: Flaherty, Kenary, Lyons, Lawlor and Croughwell. Plaintiff's 56(c)(2) Statement ¶¶ 61-63, 169-173.

In response to, and in retaliation for what Chief Croughwell suspected to be a threat against him and his department, Chief Croughwell engaged in the following extreme, outrageous, illegal and unlawful acts in a direct attempt to cause injury, pain, humiliation, defamation and financial loss upon Russo:

Croughwell conspired with Flaherty to illegally arrest and detain Russo under the pretext of required drug testing.  Croughwell, Flaherty and Reynolds all violated the HPD Drug Testing Policy. Plaintiff's 56(c)(2) Statement Section XIII.  On or about November 5, 1997, days after Croughwell threatened to physically harm Russo, Croughwell ordered Flaherty and two other

4

police sergeants to go to United States Attorney's office in New Haven, Connecticut to illegally take Russo into custody, take his hand gun and drive him from the United States Attorney's Office where Russo was working for the FGTF. Plaintiff was in fear for his life. <u>Plaintiff's 56(c)(2) Statement Section XIII</u>; Flaherty physically took the plaintiff back to Hartford and forced him to immediately submit to a drug test in Bloomfield, Connecticut.

As ordered by Croughwell, Flaherty stripped Plaintiff of his firearm. While in custody, plaintiff was forced to urinate in the street. . <u>Plaintiff's 56(c)(2) Statement Section XIII</u>.

The defendants' thereafter set out on a course to destroy the character of Plaintiff by taking this highly confidential testing information and disseminating it amongst the general population of the Police Department even before the results were returned, and on November 5, 1997, the information was revealed by the Hartford Police Department to departmental personnel and other persons, including Maxine Bernstein, a reporter for *The Hartford Courant*. The HPD Drug Testing Policy strictly forbids any disclosure of an officer being tested. <u>Plaintiff's 56(c)(2) Statement Section XIII.</u>

### C. THE CRIMINAL INVESTIGATION AND TYLENOL 3

In his continued efforts to destroy Russo's credibility and career in order to protect himself and his department from the corruption probe, the defendants initiated a criminal investigation of Russo along with the State's Attorney for the Judicial District of Hartford, James E. Thomas. <u>Plaintiff's 56(c)(2) Statement Section V</u>.

The defendants' also duped a low-level Diversionary Inspector of the Federal Drug Enforcement Administration ("DEA") to support their criminal investigation of Russo. This Diversionary Investigator, Marcus Brown (hereinafter "Brown"), joined Kenary, Flaherty, SGT

5

Hajdaz and State's Attorney Inspector Skinner in the investigation. These officers rushed to build a case, any case, against Russo.

Without any complaint, this Joint Investigative Team (hereinafter "JIT") conducted an expansive illegitimate[2] and unprecedented investigation to determine if Russo was abusing Tylenol 3 that they illegally learned he was prescribed by his physian. This fishing expedition was a vindictive investigation to gather incriminating evidence. Plaintiff's 56(c)(2) Statement Section V.

As part of this investigation, Brown entered pharmacies in Detective Russo's neighborhood and around the vicinity of Russo's physician, Dr. Buccheri's office demanding Russo's patient profile and prescriptions; no other patient profiles were gathered. Id. Brown was not conducting routine administrative inspections, but instead was aiding the Hartford Police Department and the State's Attorney's Office in their criminal investigation into Detective Russo. Id.

The defendants' arrested Russo on December 16, 1997 and charged him with Forgery in the second degree and illegally obtaining a controlled substance, Tylenol #3, by fraud. Plaintiff's 56(c)(2) Statement Section XIII XV. While Russo was under investigation and just prior to his arrest he was transferred by the defendants' from Capers to the Fraud Division.

On December 16, 1997, the Plaintiff was suspended without pay pending the outcome of his criminal trial. From December 16, 1997, to the present, the Union Defendant did not challenge the Hartford Police Department's suspension of the Plaintiff.

---

[2]The United State's Attorney's Office, and in particular, Russo's supervisor, Deputy U.S. Attorney John Durham was unaware of the criminal investigation of Russo, until Russo's arrest.

6

On September 15, 2000, the Superior Court ruled that the evidence seized during the criminal investigation of Detective Russo was obtained illegally. Plaintiff's 56(c)(2) Statement¶ 189-190. On that same day, the Prosecution moved and the Court dismissed all charges against Detective Russo. Id.

From September 15, 2000 to the present, Defendant Rudewicz illegally suspended the Plaintiff without pay. Id.

### D.   MARQUIS RETALIATION AND MORE THREATS

On or about September 15, 2000 when the criminal case against Russo was dismissed by the Superior Court and February 2002, when the Connecticut Supreme Court dubiously reversed and remanded the criminal case, despite repeated requests by Russo and court intervention, the City and Chief Marquis, did not take any steps to provide a safe work environment for Russo so that he was able to return to work.

Russo was never provided any reinstatement support or administrative assistance. The Plaintiff was not paid salary, or benefits from the date his suspension legally ended, September 15, 2000, to October 31, 2000, other officers similarly situated had been paid. Russo was denied medical insurance coverage that other officers received from September 15, 2000 to October 31, 2000. Plaintiff's 56(c)(2) Statement¶ 190, 191, 196, 199, 202, 203, 214, 219, 220, 221.

The City further interfered with Russo's attempts to receive worker's compensation benefits following Russo's quadruple bypass surgery in December 2001. Plaintiff's 56(c)(2) Statement¶ 216-218.

**III.    LEGAL ARGUMENT**

    **A.    STANDARD OF REVIEW.**

In a motion for summary judgment, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law. Rule 56(c), F.R.C.P.; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202, 217 (1986). A court must grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact...." Miner v. Gen. Falls, 999 F.2d 655, 661 (2d Cir. 1993)(citation omitted). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Aldrich v. Randolph Cent. Sch. Dist., 963 F.2d 520, 523 (2d Cir. 1992).

After discovery, if the nonmoving party "has failed to make sufficient showing on an essential element of his case with respect to which he has the burden of proof," then summary judgment is appropriate. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265, 273 (1986). The court resolves "all ambiguities and draw[s] all inferences in favor of the nonmoving party in order to determine how a reasonable jury would decide." Aldrich, 963 F.2d at 523. Thus "[o]nly when reasonable minds could not differ as to the import of the evidence is summary judgment proper." Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir.) cert. denied, 502 U.S. 849, 112 S.Ct. 152, 116 L.Ed.2d. 117 (1991). See also, Suburban Propane v. Proctor Gas, Inc., 953 F.2d 780, 788 (2d Cir. 1992).

**B.    RUSSO HAS SUFFERED AN UNDERLYING CONSTITUTIONAL VIOLATION AND CITY DEFENDANT CAN BE HELD LIABLE FOR ITS UNCONSTITUTIONAL ACTIONS.**

For the reasons argued by plaintiff in its objection to the individual defendant, Chief Bruce P. Marquis' ("Marquis"), motion for summary judgment, Plaintiff has suffered a constitutional violation due to Marquis' conduct.

**C.    CITY DEFENDANT IS LIABLE FOR RUSSO'S CONSTITUTIONAL VIOLATIONS IN COUNT SEVEN.**

"A plaintiff who seeks to recover against a municipality under § 1983 must show that the violation of his constitutional rights resulted from a municipal policy or custom." Davis v. City of New York, 75 Fed. Appx. 827, 829 (2d. Cir. 2003) (internal quotations and citations omitted).

There are four circumstances in which a policy or custom may be established. The plaintiff may establish (1) a formal policy, officially promulgated or adopted by the municipal defendant, Monell v. Department of Social Servs., 436 U.S. 658, 690, 56 L. Ed. 2d 611 (1978), or (2) a specific action or decision by an official responsible for establishing final policy with respect to the subject matter, if that action or decision caused the violation of plaintiff's constitutional rights, Pembaur v. City of Cincinnati, 475 U.S. 469, 483-84, 89 L. Ed. 2d 452 (1986) (plurality opinion), or (3) the existence of an unlawful practice by subordinate officials so permanent and well settled as to constitute a 'custom or usage' and proof that this practice was so manifest or widespread as to imply the constructive acquiescence of the policy-making officials, City of St. Louis v. Praprotnik, 485 U.S. 112, 127, 130, 99 L. Ed. 2d 107 (1988); Sorlucco v. New York City Police Dept., 971 F.2d 864, 871 (2d Cir. 1992), or (4) the failure of the City to train or supervise its employees in a fashion designed to prevent the violation of plaintiff's rights,

9

if such failure amounts to 'deliberate indifference' to the rights of those with whom the municipal employees will come into contact. Gottlieb v. County of Orange, 84 F.3d 511, 518 (2d Cir. 1996); Walker v. New York, 974 F.2d 293, 297 (2d Cir. 1992).

The City is potentially liable on three separate theories: (1) The City is liable for Marquis' actions, of which Marquis had final policymaking authority; and/or (2) Although Marquis does not have final policymaking authority, the City is liable because of its policy of inadequate training and supervision in deliberate indifference to Russo's constitutional rights; and/or (3) Although Marquis does not have final policymaking authority, the City is liable because the practice of harassing, retaliating against, shunning and interfering with Hartford Police Officers who investigate other Hartford Police Officers and/or cooperate with the Federal Government is so permanent and well settled as to imply the constructive acquiescence of senior policy-making officials.

### 1. City is Liable Because of Marquis' Actions, of which He Had Final Policymaking Authority.

"Actions by an individual with final decision-making authority in a municipality constitute official policy for purposes of a § 1983 claim." Anthony v. City of New York, 339 F.3d 129, 139 (2d Cir. 2003) (citing Pembaur v. City of Cincinnati, 475 U.S. 469, 483-84, 89 L. Ed. 2d 452 (1986). The individual must be responsible for establishing final government policy" in order for municipal liability to attach." Anthony v. City of New York, 339 F.3d 129, 139 (2d Cir. 2003).

"Whether the official in question possessed final policymaking authority is a legal question, which is to be answered on the basis of state law. The relevant legal materials, include

10

state and local positive law as well as custom or usage having the force of law." Jeffes v. Barnes, 208 F.3d 49, 57 (2d Cir. 2000).

In applying the Pembaur standard, The Second Circuit has explained that where an official has final authority over significant matters involving the exercise of discretion, the choices he makes represent government policy. An official has final authority if his decisions, at the time they are made, for practical or legal reasons constitute the municipality's final decisions. Anthony v. City of New York, 339 F.3d 129, 139 (2d Cir. 2003) (quoting Rookard v. Health & Hosps. Corp., 710 F.2d 41, 45 (2d Cir. 1983). Such a policy may be inferred from circumstantial proof. Gagne v. DeMarco, 281 F. Supp. 2d 390, 398 (D. Conn. 2003).

In O'Connor v. Barnes, 1998 U.S. Dist. LEXIS 3386 (N.D.N.Y. March 18, 1998) Judge Kahn was presented with the question of whether a County Sheriff is a policymaking official. Id. at 14. Judge Kahn noted that the Sheriff is responsible for matters of supervision, discipline, scheduling and training within the Sheriff's Department. Id. at 14-15. The municipality argued that the Sheriff is not a policymaker for the County because he is an elected official and because the County does not direct or control personnel of the Sheriff's Department. Id. at 115.

Judge Kahn, relying on previous Second Circuit cases which found that a Sheriff is a policymaker for the County in which he is employed, found the Sherif to be a policymaker. Id. (citing to Weber v. Dell, 804 F.2d 796, 803 (2d Cir. 1986) (1987); Heisler v. Kralik, 981 F. Supp. 830, 841 (S.D.N.Y. 1997); Wagner v. County of Cattaraugus, 866 F. Supp. 709, 718 (W.D.N.Y. 1994) (County not liable for arrests made without probable cause where there was "no evidence that the Sheriff ever condoned or acquiesced in these arrests")).

11

Judge Kahn then went on to find that retaliation was in the scope of the Sheriff's policymaking authority. Id. at 17-21.

Defendant contends that, "the mere fact that the [City] Charter provided Marquis with the authority to appoint and remove employees, to enact rules and regulations, and to administer discipline, does not mean that he was delegated with final policy-making authority." (Defendant's Mem. At 23-24.) In fact, Marquis did have final policy-making authority in a number of areas. Marquis, as the Chief, had the final decision making authority on suspensions, terminations and discipline. Marquis also had final decision making authority on training and overtime issues. Marquis also set the policy on "re-suspending" Russo and failing to eliminate the hostile work environment that Russo was subject to.

  **2. City is Liable Because of its policy of inadequate training and supervision in Deliberate Indifference to Russo's Constitutional Rights.**

If Marquis did not have final policymaking authority, the City Defendant is still liable as those with final policymaking authority knew that Hartford Police Officers would investigate other Hartford Police Officers to a moral certainty; knew that training would make the situation less likely to occur; and knew that without the training the occurrence would frequently cause the deprivation of officer's Constitutional rights. "The existence of an official municipal policy or custom can also be demonstrated by establishing a deliberate government policy of failing to train or supervise its officers." Anthony v. City of New York, 339 F.3d 129, 139 (2d Cir. 2003) (citing City of Canton, Ohio v. Harris, 489 U.S. 378, 388-89, 103 L. Ed. 2d 412 (1989)). "Municipal liability attaches 'only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact.'" Anthony v. City of New York,

12

339 F.3d 129, 139 (2d Cir. 2003) (quoting City of Canton, Ohio v. Harris, 489 U.S. at 388)

To support a claim that a municipality's failure to train amounted to deliberate indifference, a plaintiff must show: (1) that a policymaker of the municipality knows to a moral certainty that its employees will confront a given situation; (2) that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation; and (3) that the wrong choice by the employee will frequently cause the deprivation of a citizen's constitutional rights. Nicholson v. Scoppetta, 344 F.3d 154, 166 (2d Cir. 2003).

City Defendant frames the failure to adequately train and/or supervise issue as a failure to "prevent [Marquis] from refusing to reverse past personnel decisions regarding a police officer for the sole purpose of continuing an alleged vendetta against that officer." (Def. Mem. at 26.) Plaintiff's specifically deny that this is the policy complained as Plaintiff's complaint, as supported by Plaintiff's 56(a)2 statement, alleges that the City failed or refused to "promulgate and enforce appropriate guidelines, regulations, policies, practices, procedures or customs regarding personnel actions and discipline of officers" as well as failed or refused to "take appropriate investigatory, supervisory and, or, disciplinary action against City of Hartford supervisors with regard to the negligent, reckless, malicious, deliberate, indifferent, willful, intentional and unlawful conduct complained of." (Amended Complaint Count Seven, ¶¶ 3(A), 3(C), Plaintiff's 56(a)2 Statement 204. More specifically, many of these allegations amount to a failure to promulgate and enforce rules and policies regarding the treatment of Hartford Police Officers who are investigating other police officers and working with the Federal Government.

The second element of the Second Circuit's deliberate indifference test requires plaintiff to show that the situation **either** presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation. Nicholson v. Scoppetta, 344 F.3d 154, 166 (2d Cir. 2003). Chief Marquis was faced with a difficult choice of the sort that training or supervision would make less difficult.

In Galindez v. Miller, 285 F. Supp. 2d 190, 198 (D. Conn. 2003) the court denied the City of Hartford's request for summary judgment. The court in Galindez focused on whether Hartford and its policymakers maintained a policy of tacitly approving or tolerating the use of excessive force. In their examination, the court noted that between 1999 and 2001, there were seventy-three complaints lodged against Hartford police officers and during those same years there were 39 lawsuits filed against Hartford and/or its police officers alleging excessive force. Id. While the City settled many of the lawsuits, the city did not sustain a single complaint in its internal investigations and its internal investigations resulted in not a single officer being disciplined. Id.

A reasonable inference from Galindez is that for some reason, Hartford Police investigating their fellow officers had a difficult time gathering enough evidence to sustain complaints. Although the present case does not involve civilian complaints, it does involve the investigation of officers for wrongdoing. Plaintiff investigated officers for wrongdoing. This is a common occurrence as noted that between 1999 and 2001 Hartford Police investigated seventy-three complaints against its own officers regarding the use of excessive force alone.

Similarly, the HPD has a history of mishandling similar situations where officers are investigating misconduct of their brethren. Plaintiff's 56(a)2 Statement ¶ 204. The wrong choice by the HPD in investigating its own officers will frequently cause the deprivation of citizen's

14

constitutional rights.

Even if Marquis does not have final policymaking authority, the city is liable because the practice of harassing, retaliating against, shunning and interfering with those who make complaints or investigate other Hartford police officers is so permanent and well settled as to imply the constructive acquiescence of senior policy-making officials. Plaintiff's 56(a)2 ¶ Statement 273.

"The policy or custom used to anchor liability need not be contained in an explicitly adopted rule or regulation Constitutional deprivations actionable under § 1983 may be visited pursuant to governmental custom even though such custom has not received formal approval through the body's official decision-making channels so long as the discriminatory practices of city officials are persistent and widespread, they could be so permanent and well settled as to constitute a custom or usage with the force of law, and thereby generate municipal liability." Sorlucco v. New York City Police Dep't, 971 F.2d 864, 870-71 (2d Cir. 1992) (internal citations and quotations omitted). "However, before the actions of subordinate city employees can give rise to § 1983 liability, their discriminatory practice must be so manifest as to imply the constructive acquiescence of senior policy-making officials." Id. (internal citations and quotations omitted).

In Ward v. New York City Transit Auth., 1999 U.S. Dist. LEXIS 9621 *17-20 (S.D.N.Y. 1999) the court found that the plaintiff presented adequate evidence of the existence of a widespread and settled practice of the N.Y. City Transit Authority ("CTA") to retaliate against employees who complain about illegal or improper conduct. The court stated:

To be sure, the plaintiff's odyssey itself extended from 1992 to 1995, illustrative of at

15

least the CTA's persistence. More significantly, the plaintiff's evidence that his termination was the result of a concerted retaliatory effort by. . . CTA officials at multiple levels of the municipal hierarchy ranging from the general manager of the Manhattan Division of Buses down to the plaintiff's immediate supervisor -- can be seen under Second Circuit standards to constitute a 'persistent and widespread' practice or a 'systemic maladministration' at the CTA. Here, the practice was pervasive in that an employee such as [plaintiff] was blocked at every turn, i.e. at multiple management levels, for simply asserting his right to speak out against corruption and mismanagement. Indeed, what the plaintiff attempted to prove, and the jury believed, was an invidious coverup -- extending from the union leaders to high-level management -- that demonstrated a policy and practice that inhibited free speech amongst employees at the CTA.

This is the same as the present case, as exemplified by: (1) O'Connell's investigation of the Drug Factory Kit, which did not result in a criminal investigation, not even a reasonable suspicion drug test of either Edelwich, Miele, Lawlor or Lyons. Similarly, the investigation of the Lawlor and Kornbrath's threats were not investigated by a independent officer.

The City has a history and pattern of not properly investigating officers's misconduct. The City also has a pattern and practice of retaliating against those who step forward and complain against Hartford Police Officers. Plaintiff's 56(a)2 ¶ Statement 273.

The City has retaliated against Russo by denying him workers' compensation benefits although he was provided with health coverage for the quadruple bypass surgery. Plaintiff's 56(a)2 Statement ¶ 213-218. The City has contested the benefits and the City's attorney in this case has interfered with the receipt Russo's benefits. On July 12, 2002, two days following Russo's deposition he was notified that health benefits were discontinued as of June 30, 2002. These actions by the City are intended for the sole purpose of financially ruining Russo in retaliation for these three lawsuits and his assistance with the federal government, so that he is not able to pursue the expense of litigating the present cases.

The City is liable for the retaliation against Russo in that they failed to protect him, failed to remedy the wrongs against him and continue to penalize and retaliate against him through the present. Therefore, the City's Motion for Summary Judgment should be denied.

## CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment on Plaintiff's Seventh Count should be denied.

THE PLAINTIFF,
NICHOLAS O. RUSSO, JR.

By: *Erin O'Neil*
James S. Brewer
Erin I. O'Neil
Brewer & O'Neil, LLC
818 Farmington Avenue
West Hartford, CT  06119
(860) 523-4055
Federal Bar # ct 23073

17

## CERTIFICATION

This is to certify that the foregoing has been faxed on March 19, 2004, to all counsel and pro se parties of record:

Charles L. Howard, Esq.
Gregg P. Goumas Esq.
Derek Mogck, Esq.
Shipman & Goodwin LLP
One American Row
Hartford, CT 06103-2819

John P. Shea, Jr.
Sabia & Hartley, LLC
190 Trumbull Street
Suite 202
Hartford, CT 06103-2205

Frank Szilagyi, Esq.
Silvester, Daly & Delaney
72 Russ Street
Hartford, CT 06106

Attorney Helen Apostolidis
Office of Corporation Counsel
City of Hartford
550 Main Street
Hartford, CT 06103

_____
Erin I. O'Neil