**UNITED STATES DISTRICT COURT** FILED
**DISTRICT OF CONNECTICUT**

2004 MAR 19 P 2: 04

U.S. DISTRICT COURT
BRIDGEPORT CONN

NICHOLAS O. RUSSO, JR.,           :   CIVIL ACTION NO.
             PLAINTIFF,        :   3:00CV 2382 (JCH)
                                 :
                                 :
VS.                              :
                                 :
                                 :

BRUCE P. MARQUIS, CHIEF OF POLICE,   :
IN HIS INDIVIDUAL AND OFFICIAL ,      :
             DEFENDANT.       :      MARCH 19, 2004

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO MARQUIS'S
MOTION FOR SUMMARY JUDGMENT**

Pursuant to Rule 56 of the of the Federal Rules of Civil Procedure, the plaintiff

hereby objects to the motion for summary judgement filed by the defendant, Bruce

Marquis,  in the case of Russo v. Marquis, Docket No. 3:00CV2382 (JCH).  This case is

one of three cases brought by the plaintiff that has been consolidated for discovery

purposes.  The defendant is not entitled to summary judgment as a matter of law because

the plaintiff has been successful in presenting genuine issues of material facts.

**I.**    **INTRODUCTION**

This action is brought by plaintiff against defendants, who acting under color of

state and municipal law, charter, ordinance, regulation, custom or usage, have unlawfully

violated plaintiff's civil rights to redress in this Court without retaliation, equal

protection, and substantive and procedural due process in violation of the First and

1

Fourteenth Amendments to the United States Constitution. Plaintiff also brings this action

against defendants for common law claim of intentional infliction of emotional distress.

## II.   STATEMENT OF FACTS

### A.   PRELIMINARY STATEMENT

The plaintiff, Nicholas O. Russo, Jr. (herinafter "Russo") was[1] a Detective with

the Hartford Police Department  Hartford Police Department (hereinafter "HPD") .

Beginning in September, 1994 Russo was assigned to the HPD Crimes Against Persons

Unit [presently referred to as "Major Crimes"] (hereinafter, "CAPERS"). In 1995, Russo

was assigned to the Federal Violent Crimes Task Force, or Federal Gang Task Force.

(hereinafter "FGTF"). Russo's investigative work for the HPD and the FGTF was

outstanding and exemplary. Plaintiff's 56(c)(2) Statement ¶¶ 5-16.

There was tremendous animosity and conflict between HPD Detectives assigned

to CAPERS and FBI Agents and HPD Detectives assigned to the FGTF. Plaintiff's

56(c)(2) Statement Section II.. The FGTF's quick resolution, and therefore, deprivation

of HPD Capers personnel overtime, of homicides and Russo's cooperation with the

federal Government became a contentious issue in the ranks of the HPD and the

Connecticut State's Attorney Office. As a result, Detective Russo became the target of

selective enforcement of departmental rules and regulations, illegal drug testing, false

arrest and imprisonment, harassment, stalking and derogatory comments and threats on

---

[1]The plaintiff will be referred to as a former Hartford Police Detective although he has not been formally notified of his termination by the City of Hartford. He has, however been denied all pay, benefits and seniority since his arrest on December 16, 1997(except for a short period of time when the criminal charges were dismissed by the Superior Court).  Therefore, plaintiff considers to have been discharged by the defendant City of Hartford.

his life.

Finally, in the fall of 1997 Russo became the subject of a vindictive criminal investigation, instigated by named defendants who wanted to ruin his credibility and career.

Russo's supervisors, including, Lieutenant Kenary, Captian Flaherty and Chief Croughwell were very bitter and then frightened about Russo's involvement with the Federal Government. Named defendants Croughwell, Lyons, Lawlor, and Flaherty believed Russo was providing incriminating information about corrupt acts they either committed, approved or covered up. On October 31, 1997, after learning from State Inspector Stephen Kumnick, Chief State's Attorney John Bailey and thereafter HPD Capers Detective Rovella that Russo was assisting in a criminal investigation into corruption at the HPD, Croughwell, Lawlor and Lyons, among others, threatened to, " kick [Russo's] fucking ass." Thereafter, Croughwell ordered Russo taken into Custody, his weapon taken, illegally drug tested and removed from duty. Croughwell also ordered Russo to submit to a lie detector test (polygraph) to determine the truthfulness of Russo's denial of involvement in the Federal Corruption investigation. Given the threats and refusing to compromise the federal investigation, Russo refused to admit his involvment to these criminals.

Concerned with the expansive knowledge and investigative ability of Russo, and their own criminal and unethical conduct, the defendants' set about on a course of action aimed solely at destroying Detective Russo's reputation, career and life. Plaintiff's 56(c)(2) Statement Section II..

3

**B.    THE POPE PARK MURDER, ILLEGAL DRUG TESTING, DISCLOSURE OF TESTING AND OTHER HARASSMENT**

On January 9, 1997,  Russo's supervisor, Daryl Roberts improperly marked Russo AWOL, after Russo called in sick, following the normal procedure and after providing Lt. Kenary and Sgt. Roberts with a note from his Physician.  Plaintiff's 56(c)(2) Statement VII(A). Plaintiff was subjected to hostile and disparate treatment by his superiors at the Hartford Police Department.  On January 9, 1997, Russo was subjected to an illegal drug test without reasonable cause or suspicion.  Plaintiff's 56(c)(2) Statement Section XIII(A).    Following the Pope Park Murder in July, 1997,  Russo lead the criminal investigation for the FGTF which two days after the murder lead to the arrest, and later, conviction of the murderer Julio Ramos, the resentment of Russo dramatically increased. (Plaintiff's 56(c)(2) Statement Section II(A))

In 1997, Russo volunteered to assist U.S. Attorneys John Durham and James Glasser in a federal corruption investigation into the HPD. Plaintiff's 56(c)(2) Statement ¶ 61, 63, 68, 69.  Russo's involvement with the federal corruption probe was leaked to the targets of the probe by State's Attorney Inspector Stephen Kumnick and then Chief State's Attorney John Bailey.  The targets of the federal investigation  included the defendants: Flaherty, Kenary, Lyons, Lawlor and Croughwell. Plaintiff's 56(c)(2) Statement ¶¶ 61-63, 169-173.

In response to, and in retaliation for what Chief Croughwell suspected to be a threat against him and his department, Chief Croughwell engaged in the following extreme, outrageous, illegal and unlawful acts in a direct attempt to cause injury, pain,

4

humiliation, defamation and financial loss upon Russo:

Croughwell conspired with Flaherty to illegally arrest and detain Russo under the pretext of required drug testing. Croughwell, Flaherty and Reynolds all violated the HPD Drug Testing Policy. Plaintiff's 56(c)(2) Statement Section XIII. On or about November 5, 1997, days after Croughwell threatened to physically harm Russo, Croughwell ordered Flaherty and two other police sergeants to go to United States Attorney's office in New Haven, Connecticut to illegally take Russo into custody, take his hand gun and drive him from the United States Attorney's Office where Russo was working for the FGTF. Plaintiff was in fear for his life. Plaintiff's 56(c)(2) Statement Section XIII; Flaherty physically took the plaintiff back to Hartford and forced him to immediately submit to a drug test in Bloomfield, Connecticut.

As ordered by Croughwell, Flaherty stripped Plaintiff of his firearm. While in custody, plaintiff was forced to urinate in the street. . Plaintiff's 56(c)(2) Statement Section XIII.

The defendants' thereafter set out on a course to destroy the character of Plaintiff by taking this highly confidential testing information and disseminating it amongst the general population of the Police Department even before the results were returned, and on November 5, 1997, the information was revealed by the Hartford Police Department to departmental personnel and other persons, including Maxine Bernstein, a reporter for *The Hartford Courant.* The HPD Drug Testing Policy strictly forbids any disclosure of an officer being tested. Plaintiff's 56(c)(2) Statement Section XIII.

## C.    THE CRIMINAL INVESTIGATION AND TYLENOL 3

In his continued efforts to destroy Russo's credibility and career in order to protect himself and his department from the corruption probe, the defendants initiated a criminal investigation of Russo along with the State's Attorney for the Judicial District of Hartford, James E. Thomas.  Plaintiff's 56(c)(2) Statement Section V.

The defendants' also duped a low-level Diversionary Inspector of the Federal Drug Enforcement Administration ("DEA") to support their criminal investigation of Russo.  This Diversionary Investigator, Marcus Brown (hereinafter "Brown"), joined Kenary, Flaherty, SGT Hajdaz and State's Attorney Inspector Skinner in the investigation.  These officers rushed to build a case, any case, against Russo.

Without any complaint, this Joint Investigative Team (hereinafter "JIT") conducted an expansive illegitimate[2] and unprecedented investigation to determine if Russo was abusing Tylenol 3 that they illegally learned he was prescribed by his physian.  This fishing expedition was a vindictive investigation to  gather incriminating evidence. Plaintiff's 56(c)(2) Statement Section V.

As part of this investigation, Brown entered pharmacies in Detective Russo's neighborhood and around the vicinity of Russo's physician, Dr. Buccheri's office demanding Russo's patient profile and prescriptions; no other patient profiles were gathered. Id. Brown was not conducting routine administrative inspections,  but instead was aiding the Hartford Police Department and the State's Attorney's Office in their

_____

[2]The United State's Attorney's Office, and in particular, Russo's supervisor, Deputy U.S. Attorney John Durham was unaware of the criminal investigation of Russo, until Russo's arrest.

6

criminal investigation into Detective Russo. Id.

The defendants' arrested Russo on December 16, 1997 and charged him with Forgery in the second degree and illegally obtaining a controlled substance, Tylenol #3, by fraud. Plaintiff's 56(c)(2) Statement Section XIII XV.  While Russo was under investigation and just prior to his arrest he was transferred by the defendants' from Capers to the Fraud Division.

On December 16, 1997, the Plaintiff was suspended without pay pending the outcome of his criminal trial. From December 16, 1997, to the present, the Union Defendant did not challenge the Hartford Police Department's suspension of the Plaintiff.

On September 15, 2000, the Superior Court ruled that the evidence seized during the criminal investigation of Detective Russo was obtained illegally. Plaintiff's 56(c)(2) Statement¶ 189-190.  On that same day, the Prosecution moved and the Court dismissed all charges against Detective Russo. Id.

From September 15, 2000 to the present, Defendant Rudewicz illegally suspended the Plaintiff without pay. Id.

### D.    MARQUIS  RETALIATION AND MORE THREATS

On or about September 15, 2000 when the criminal case against Russo was dismissed by the Superior Court and February 2002, when the Connecticut Supreme Court dubiously reversed and remanded the criminal case,  despite repeated requests by Russo and court intervention, the City and Chief Marquis, did not take any steps to provide a safe work environment for Russo so that he was able to return to work.

Russo was never provided any reinstatement support or administrative assistance. The Plaintiff was not paid salary, or benefits from the date his suspension legally ended, September 15, 2000, to October 31, 2000, other officers similarly situated had been paid. Russo was denied medical insurance coverage that other officers received from September 15, 2000 to October 31, 2000. <u>Plaintiff's 56(c)(2) Statement</u>¶ 190, 191, 196, 199, 202, 203, 214, 219, 220, 221.

The City further interfered with Russo's attempts to receive worker's compensation benefits following Russo's quadruple bypass surgery in December 2001. Plaintiff's 56(c)(2) Statement¶ 216-218.

## III.  LEGAL ARGUMENT

### A.    STANDARD OF REVIEW

In a motion for summary judgment, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law. Rule 56(c), F.R.C.P.; <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202, 217 (1986). A court must grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact...." <u>Miner v. Gen. Falls</u>, 999 F.2d 655, 661 (2d Cir. 1993)(citation omitted). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Aldrich v. Randolph Cent. Sch. Dist.</u>, 963 F.2d 520, 523 (2d Cir. 1992).

8

After discovery, if the nonmoving party "has failed to make sufficient showing on an essential element of his case with respect to which he has the burden of proof," then summary judgment is appropriate. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265, 273 (1986). The court resolves "all ambiguities and draw[s] all inferences in favor of the nonmoving party in order to determine how a reasonable jury would decide." Aldrich, 963 F.2d at 523. Thus "[o]nly when reasonable minds could not differ as to the import of the evidence is summary judgment proper." Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir.) cert. denied, 502 U.S. 849, 112 S.Ct. 152, 116 L.Ed.2d. 117 (1991). See also, Suburban Propane v. Proctor Gas, Inc., 953 F.2d 780, 788 (2d Cir. 1992).

### B.    MARQUIS VIOLATED RUSSO'S FIRST AMENDMENT RIGHTS (COUNT ONE).

To prevail on a First Amendment retaliation claim the plaintiff must establish: "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." Garcia v. S.U.N.Y. Health Sciences Center, 280 F.3d 98 (2nd Cir. 2001).

### 1.    Russo's Speech Was Protected.

Whether speech addresses a matter of public concern is determined "by the content, form, and context of a given statement, as revealed by the whole record." Connick v. Myers, 461 U.S. 138, 147-48 (1983). "To fall within the realm of public concern, moreover, an employee's speech must 'relate to a ... matter of political, social, or

9

other concern to the community.'" Locurto v. Giuliani, 269 F. Supp. 2d 368, 385 (2d Cir. 2003) (quoting Connick v. Myers, 461 U.S. 138, 146 (1983)).

The First Amendment protects the right of public employees to join together in a union, to seek redress for grievances through that collective entity, and to be free from retaliation for engaging in such activities. Smith v. Arkansas State Highway Employees, 441 U.S. 463, 464-65, 60 L. Ed. 2d 360, 99 S. Ct. 1826 (1979).

Though a public employee's speech is constitutionally protected only when it can "be fairly characterized as constituting . . . a matter of public concern," Morris, 196 F.3d at 110 (quoting Connick, 461 U.S. at 140), the Second Circuit has not yet ruled on whether the "public concern" requirement applies to hybrid free speech/freedom of association claims made by public employees. Petrario v. Cutler, 187 F. Supp. 2d 26, 32 (D. Conn. 2002). Even if the "public concern" requirement were to apply to claims of freedom of association, union activity is always a matter of public concern. See Clue v. Johnson, 179 F.3d 57, 61 (2d Cir. 1999) (" retaliation solely for union activity clearly raises a public concern under Connick"). Likewise, the "filing of grievances . . . involve matters of public concern and are therefore protected speech." Morris v. Lindau, 196 F.3d 102, 113 (2d Cir. 1999).

Speech will be fairly characterized as a matter of public concern if it relates to any matter of political, social, or other concern to the community. See Connick, 461 U.S. at 146.) "When a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of a personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the

10

wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior." Connick, 461 U.S. at 147.

Speech that relates primarily to matters of personal interest or internal office affairs, in which the individual speaks as an employee rather than as a citizen, cannot support a First Amendment claim.  White Plains Towing Corp. v. Patterson, 991 F.2d 1049, 1058 (2d Cir. 1993) (quoting Connick, 461 U.S. at 147).

For example, a personal desire for a particular work assignment is not a matter of public concern.  Id. Nor are complaints about one's treatment in a professional training program a matter of public concern. Ezekwo, 940 F.2d 775, 781.  The fundamental question is whether the employee is seeking to vindicate personal interests or bring to light a matter of political, social,  or other concern to the community. Rao v. NYC Health & Hospitals Corp., 905 F. Supp. 1236, 1243 (S.D.N.Y. 1995).

Investigation of police corruption is protected speech. Moskowitz v. Coscette, 3 Fed. Appx. 1, 4-5 (2d Cir. 2001) ("The court did not err in instructing the jury that the plaintiff's statements that allegedly gave rise to retaliation against him constituted protected speech. The plaintiff's statements related to actions by other officers that involved the safety of the public or corruption within the police department."); White-Ruiz v. City of New York, 983 F. Supp. 365, 380, 384 (S.D.N.Y. 1997) (holding City liable for unwritten Police Department policy to retaliate against officers who exposed police corruption;  stating, the reporting of another officer's dishonesty was "plainly about a matter of public concern and not about a matter personal to her, since she was reporting a serious act of dishonesty by a fellow officer."); Birmingham v. Ogden, 70

11

F. Supp. 2d 353, (S.D.N.Y. 1999) (finding that allegations by police officer that Chief

and members of the Board of Police Commissioners were corrupt constitute protected

speech); Gros v. Port Wash. Police Dep't, 944 F. Supp. 1072, 1085 (E.D.N.Y. 1996)

("The jury could have determined that the defendants' subsequent acts of harassment were

in retaliation for the plaintiff's clearly constitutionally protected activity, namely raising

issues of corruption in the top echelon of the Police District.") see also Rookard v.

Health & Hospitals Corp., 710 F.2d 41, 46 (2d Cir. 1986) ("An allegation of corrupt and

wasteful practices at a large municipal hospital, made to the city official empowered to

investigate such charges, obviously involves a matter of public concern.")

In many instances "expressive conduct" as opposed to speech is protected under

the First Amendment.  With regard to expressive conduct the Second Circuit has stated:

> For purposes of the First Amendment, the Supreme Court has
> repeatedly rejected the view that an apparently limitless variety of
> conduct can be labeled 'speech' whenever the person engaging in the
> conduct intends thereby to express an idea. . . [I]n East Hartford Educ.
> Ass'n v. Bd. of Educ. of the Town of East Hartford, 562 F.2d 838 (2d
> Cir. 1977), [ ] we recognized that acknowledging the symbolic
> speech-like qualities of a course of conduct is 'only the beginning, and
> not the end, of constitutional inquiry.'
>   To determine whether conduct is expressive and entitled to
> constitutional protection requires an inquiry into whether the activity
> is sufficiently imbued with the elements of communication to fall
> within the scope of the First and Fourteenth Amendments. . . . To be
> sufficiently imbued with communicative elements, an activity need
> not necessarily embody a narrow, succinctly articulable message, but
> the reviewing court must find, at the very least, an intent to convey a
> particularized message along with a great likelihood that the message
> will be understood by those viewing it.

Zalewska v. County of Sullivan, 316 F.3d 314, 319 (2d. Cir. 2003) (internal citations and

12

quotations omitted).

Defendants note that he "could find no case law recognizing a law enforcement officer's Constitutional right to associate with other law enforcement officials." (Def. Mem. At 13.)  This is not surprising as the protected right is the communications that Russo had with the federal investigation in attempts to expose corruption at the HPD.

### 2.    Marquis Took Adverse Action Against the Russo.

"Adverse employment actions include discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand. . . .lesser actions may meet the adversity threshold,  but we have not explicitly defined what quantum of lesser actions constitutes an adverse employment action."  Phillips v. Bowen, 278 F.3d 103, 109 (2d Cir. 2002).  A suspension is an adverse employment action.  See, e.g., Lovejoy-Wilson v. NOCO Motor Fuel, Inc., 263 F.3d 208, 223 (2d Cir. 2001) (holding that suspension without pay for one week, even if plaintiff was later reimbursed, constituted an adverse employment action); Wideman v. Wal-Mart Stores, Inc., 141 F.3d 1453, 1456 (11th Cir. 1998) (holding that a one-day suspension constituted one of the numerous adverse employment actions taken against plaintiff); Parkinson v. Anne Arundel Med. Ctr., Inc., 214 F. Supp.2d 511, 518 (D.Md. 2002) (holding that plaintiff's one-day, unpaid suspension could constitute an adverse employment action).

The Supreme Court has stated that the First Amendment "protects state employees not only from patronage dismissals but also from even an act of retaliation as trivial as failing to hold a birthday party for a public employee . . . when intended to punish her from exercising her free speech rights."  Rutan, 497 U.S. 62, 75 n.8 (1990).

13

Since the <u>Rutan</u> decision, the Second Circuit "allows a combination of seemingly minor incidents to form the basis of a constitutional retaliation claim once they reach a critical mass." <u>Phillips v. Bowen</u>, 278 F.3d 103, 109 (2d Cir. 2002). Russo has suffered numerous adverse actions against him. Marquis, specifically failed to properly investigate claims of threats and harassment against Russo. Marquis also "re-suspended" Russo after Acting Chief Rudewicz notified Russo that he was reinstated. Marquis did not make any efforts to provide Russo with a safe work environment, thus making Russo unable to return to work.

### 3.     That There Was a Causal Connection Between Russo's Protected Speech and the Adverse Action.

The Second Circuit has held that a causal connection between a protected activity and adverse employment action can be established indirectly, through circumstantial evidence, by showing that the protected activity was followed by discriminatory treatment. <u>Sumner v. United States Postal Serv.</u>, 899 F.2d 203, 209 (2d Cir. 1990)

Plaintiff's arrest , re-suspensions and constructive discharge were retaliatory, vindictive, and in direct response for Plaintiff's role in investigating and exposing corrupt practices of the Hartford Police Department, all in violation of the First Amendment of the United States Constitution. Therefore, Marquis' Motion for Summary Judgment should be denied.

### C.     MARQUIS HOSTILE WORK ENVIRONMENT.

Employment discrimination claims brought pursuant to 42 U.S.C. §§ 1983, including those alleging a hostile work environment, are evaluated under the same

14

analytical framework as claims brought under Title VII. See, e.g., Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 69 (2d Cir. 2000); Sorlucco v. N.Y. City Police Dep't, 888 F.2d 4, 7 (2d Cir. 1989).

To survive a motion for summary judgment, a plaintiff alleging a hostile work environment must present evidence from which a reasonable fact-finder could conclude: (1) that the workplace was permeated by sufficiently severe or pervasive intimidation so as to alter the conditions of the plaintiff's work environment, and (2) that a specific factual basis exists for imputing the unlawful conduct creating the hostile environment to the plaintiff's employer. Mack, 326 F.3d at 122.

To make the requisite showing of a hostile work environment, the plaintiff must demonstrate that the environment was "both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim did perceive to be so." Faragher, 524 U.S. at 787 (citing Harris, 510 U.S. at 21-22). Determining whether the challenged conduct was objectively offensive, either in nature or in persistence, turns on the totality of the circumstances. See id. (quoting Harris, 510 U.S. at at 23); Howley v. Town of Stratford, 217 F.3d 141, 154 (2d Cir. 2000). Factors the court may consider include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Faragher, 524 U.S. at 787-88 (internal quotations omitted).

In assessing a pattern of alleged misconduct, the court should not require a showing of "a threshold magic number of harassing incidents," Richardson v. New York

15

State Dep't of Correctional Services, 180 F.3d 426, 439 (2d Cir. 1999) (internal quotations omitted), nor should the court base its evaluation solely on "how long the [challenged] innuendos, slurs, verbal assaults or obnoxious course of conduct lasts." Whidbee, 223 F.3d at 69 (quoting Carrero v. New York City Housing Auth., 890 F.2d 569, 578 (2d Cir. 1989)). Rather, it should consider the "offensiveness of the individual actions complained of in determining whether such actions are pervasive." Id. In other words, the challenged conduct must be "of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse." Whidbee, 223 F.3d at 70 (quoting Torres v. Pisano, 116 F.3d 625, 632 (2d Cir.), cert. denied, 522 U.S. 997, 139 L. Ed. 2d 404 (1997)). To withstand summary judgment, the plaintiff must demonstrate "either that a single incident was extraordinarily severe or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of her working environment." Id. (quoting Cruz v. Coach Stores, Inc., 202 F.3d 560, 570 (2d Cir. 2000)); see, e.g., Howley, 217 F.3d at 153.

As noted above, in addition to demonstrating her victimization by a hostile environment, the plaintiff must also establish a factual basis for holding the employer liable for the alleged misconduct of its agents. See Faragher, 524 U.S. at 804; Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 765, 141 L. Ed. 2d 633 (1998). This can be done by demonstrating that a "supervisor with immediate or successively higher authority over the employee" engaged in the alleged misconduct. See Mack, 326 F.3d at 123 (quoting Ellerth, 524 U.S. at 765). Alternatively, if a co-worker or employee with no actual or apparent authority over the plaintiff engaged in the alleged misconduct, the plaintiff must

16

demonstrate that "the employer either provided no reasonable avenue of complaint or knew of the harassment and did nothing about it." See Torres, 116 F.3d at 633 (quoting Kotcher v. Rosa and Sullivan Appliance Ctr., Inc., 957 F.2d 59, 62 (2d Cir. 1992)).

Defendant's conduct was hostile and abusive as perceived subjectively and objectively. On or about September 15, 2000 when the criminal case against Russo was dismissed by the Superior Court and February 2002, when the Connecticut Supreme Court dubiously reversed and remanded the criminal case, despite repeated requests by Russo and court intervention, the City and Chief Marquis, did not take any steps to provide a safe work environment for Russo so that he was able to return to work.

Russo was never provided any reinstatement support or administrative assistance. The Plaintiff was not paid salary, or benefits from the date his suspension legally ended, September 15, 2000, to October 31, 2000, other officers similarly situated had been paid. Russo was denied medical insurance coverage that other officers received from September 15, 2000 to October 31, 2000. Plaintiff's 56(c)(2) Statement¶ 190, 191, 196, 199, 202, 203, 214, 219, 220, 221.

### D. MARQUIS VIOLATED RUSSO'S FOURTEENTH AMENDMENT RIGHT TO EQUAL PROTECTION (COUNT TWO).

The Equal Protection Clause of the Fourteenth Amendment provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. Amend. XIV, § 1. "At its core, equal protection prohibits the government from treating similarly situated persons differently." Sound Aircraft Servs. v. Town of E. Hampton, 192 F.3d 329 (1999), see  City of Cleburne v. Cleburne Living Ctr., 473 U.S.

17

432, 439, 87 L. Ed. 2d 313, 105 S. Ct. 3249 (1985); Brady v. Town of Colchester, 863

F.2d 205, 216 (2d Cir. 1988).

1.    **Russo was treated differently than those similarly situated.**

Although the prototypical equal protection claim involves discrimination against

people based on their membership in a vulnerable class, the Second Circuit has long

recognized that the equal protection guarantee also extends to individuals who allege no

specific class membership but are nonetheless subjected to invidious discrimination at the

hands of government officials. Harlan Assoc. v. Incorporated Village of Mineola, 273

F.3d 494, 499 (2d Cir. 2000).  In Village of Willowbrook v. Olech, 528 U.S. 562, 564,

145 L. Ed. 2d 1060, (2000) (per curiam), "the Supreme Court affirmed the validity of

such class of one claims where the plaintiff alleges that she has been intentionally treated

differently from others similarly situated and that there is no rational basis for the

difference in treatment.

To prevail on a class of one equal-protection claim, plaintiff must show, not only

irrational and wholly arbitrary acts, but also intentional disparate treatment." Barstow v.

Shea, 196 F. Supp. 2d 141, 148 (D. Conn. 2002) (citing Olech, 528 U.S. at 564); see also

Russo v.City of Hartford, Docket No. 3-97-CV-2380 (D. Conn. 2001) (stating,

"successful equal protection claims may be brought by a "class of one," where the

plaintiff alleges that he has been intentionally treated differently from other similarly

situated and that there is no rational basis for the difference in treatment.").

18

2. **Marquis had personal involvement in Russo's Disparate Treatment.**

Personal involvement of a defendant is a prerequisite to an award for damages under § 1983. Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995). Personal involvement of a supervisory official may be established by evidence that: (1) the official participated directly in the alleged constitutional violation, (2) the official, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the official created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the official was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the official exhibited deliberate indifference to the rights of others by failing to act on information indicating that unconstitutional acts were occurring. Hill v. Taconic Developmental Disabilities Servs. Office, 283 F. Supp. 2d 955, 961 (S.D.N.Y. 2003) (quoting Colon, 58 F.3d at 873.).

Russo repeatedly requested Marquis to provide a safe environment in which to return. Plaintiff's 56(c)2 Statement ¶202. Marquis did not take action against Lawlor and Kornbrath who had threatened and followed Russo. Plaintiff's 56(c)2 Statement ¶ 204.

Marquis testified:

" A    He was offered reinstatement based on whether or not he met three conditions.  As far as I know, he did not meet those three conditions; therefore,he has not been active in the Hartford Police Department in my year and a half on the job.

Q    What did you do as his boss to help him meet these conditions, if anything?

19

A    What did I do?
Q    Yes.  What did you do?
A    I did nothing." (Dep. Marquis at 87.

Marquis deliberately did nothing to assist or protect Russo.


**E.    COUNTS THREE AND FOUR HAVE PREVIOUSLY BEEN DISMISSED.**

**F.    DEFENDANT VIOLATED RUSSO'S FOURTEENTH AMENDMENT SUBSTANTIVE DUE PROCESS RIGHTS. (COUNT FIVE)**

"'Where a particular amendment provides an explicit textual source of

constitutional protection against a particular sort of government behavior, that

Amendment, not the more generalized notion of substantive due process, must be

the guide for analyzing these claims.'" Russo v. City of Hartford, 184 F. Supp. 2d

169, 184 (D. Conn. 2002) (finding plaintiff properly alleged substantive due

process violation) (quoting Albright v. Oliver, 510 U.S. 266, 273, 127 L. Ed. 2d

114 (1994)).

### 1.    Plaintiff Had a Property Interest.

"[T]o establish a violation of either substantive or procedural due process,

plaintiff must initially show that [he] was deprived of a property or liberty

interest." Gordon v. Nicoletti, 84 F. Supp.2d 304, 309 (D. Conn. 2000).  In many

circumstances a state employee may have a property interest in continued

employment or a promotion.  See, e.g., Harhay v. Town of Ellington Bd. of Educ.,

323 F.3d 206, 212 (2d Cir. 2003) (finding contractual right to reappointment

under a collective bargaining agreement to be an important interest as opposed to

a trivial and insubstantial interest, and therefore a property interest); Board of

Regents of State Colleges v. Roth, 408 U.S. 564, 576, 33 L. Ed. 2d 548 (1972)

(discussing property interests in public employment created by tenure provisions

or employment contracts);

### 2.    Defendants' actions shock the conscience.

A claim for a substantive due process violation must "shock the

conscience." Rochin v. California, 342 U.S. 165, 172 (1952); see e.g. Russo v.

City of Hartford, 184 F. Supp. 2d 169, 196-97 (D. Conn. 2002) (finding

allegations that police chief had refused to investigate police officer's allegations

of physical threats by supervisors or to take steps to prevent potential harm by

fellow police personnel to police officer sufficiently stated a claim for a violation

of substantive due process); Jensen v. City of Oxnard, 145 F.3d 1078, 1084 (9th

Cir. 1998) (finding that, notwithstanding Collins, plaintiff police officer properly

states a claim for substantive due process violation where police officer alleges

intentional or reckless acts of a government employee directed against another

government employee).  "[T]he Due Process Clause of the Fourteenth

Amendment was intended to prevent government 'from abusing [its] power, or

employing it as an instrument of oppression.'"  De Shaney v. Winnebago County

Dept. of Social Services, 489 U.S.189, 196 (1989) quoting Davidson v. Cannon,

474 U.S. 344, 348 (1986).  Actions violate the substantive component of the Due

Process Clause only when they "can properly be characterized as arbitrary, or

conscience shocking, in a constitutional sense." Collins v. Harker Heights, 503

U.S. 115, 128 (1992); see also County of Sacremento v. Lewis, 523 U.S. 833

(1998).  Actions intended to injure in some way and unjustifiable by any

government interest will most likely be found conscience-shocking.  Id.  This is a

fact-specific inquiry that requires a case by case analysis.

Understanding that actions which would shock the conscience in one set of

circumstances could be considered completely rational in another set of

circumstances, the Supreme Court has established that the "deliberate

indifference" standard will determine if an official's actions "shock the

conscience."  Sacremento v. Lewis, 523 U.S. at 850-51; see also Betts v. Brady,

316 U.S. 455, 462 (1942).  Inherent to the word "deliberate" is the idea that the

actor must contemplate her actions within a given time frame; split-second

decisions that result in harm are not equal to those actions that are considered and

implemented over a longer period of time.  Pre-meditated actions are decidedly

more egregious and therefore often rise to the level of constitutional violation.  Id.

The Supreme Court has held, and the Second Circuit has recognized, the

subjective deliberate indifference standard to determine if an official's actions

shock the conscience.  This standard necessitates that the official actually knew of

the substantial risks of his behavior and violated the individual's rights by

responding with deliberate indifference.  See Farmer v. Brennan, 511 U.S. 825,

837 (1994); Hanrahan v. City of Norwich, 959 F.Supp. 118, 122 (D. Conn. 1997).

A government official shocks the conscience and violates one's substantive due

process rights when, given the opportunity to deliberate and decide upon a course

of action that would intentionally harm an individual, that official carries through

with such actions. <u>Daniels v. Williams</u>, 474 U.S. 327,331, 106 S.Ct. 662 (1986).

Russo requested to be returned to work in a safe environment to Chief

Marquis on April 12, 2001, which was never provided. Around April or May

2002, Russo is ordered to report to Manchester Police Department to take part in

an interview/meeting, at this meeting Lieutenant Neil Drife, Sergeant Ed Pawlina

were to be present, concerning an internal matter. (Implied in letter that it was not

safe to go to HPD, they sent him to Manchester) A failure to appear by Russo

would warrant charges under the Code of Conduct. Russo was unpaid at this time

and the City claims that he was suspended. There was no basis to order Russo to

appear and threatened violation of the Code of Conduct as Russo had already been

suspended and re-suspended for nearly five years.

This conduct was done merely to harass Russo. Similarly, the Chief's

failure to discipline the conduct of Lawlor and Kornbrath demonstrates that

Marquis deliberately took action against Russo to prevent his return to work and

continue the harassment against Russo.

### G.    MARQUIS INTENTIONALLY INFLICTED EMOTIONAL DISTRESS ON RUSSO (COUNT NINE).

To prevail on his claim for intentional infliction of emotional distress the

plaintiff must prove the following: (1) that defendant intended or should have

known that emotional distress was a likely result of their conduct; (2) that the

conduct was extreme and outrageous (3) that the conducted caused plaintiff

23

distress (4) and that the plaintiff suffered severe emotional distress. <u>Drew v. K-Mart Corp.</u>, 37 Conn App. 239, 251 (1995). To sustain a claim for intentional infliction of emotional distress, the plaintiff must show that the defendants' conduct exceeds "all bounds usually tolerated by decent society." <u>DeLaurentis v. City of New Haven</u>, 220 Conn. 225, 597 A.2d 807, 828 (1991).

Russo requested to be returned to work in a safe environment to Chief Marquis on April 12, 2001, which was never provided. Around April or May 2002, Russo is ordered to report to Manchester Police Department to take part in an interview/meeting, at this meeting Lieutenant Neil Drife, Sergeant Ed Pawlina were to be present, concerning an internal matter. (Implied in letter that it was not safe to go to HPD, they sent him to Manchester) A failure to appear by Russo would warrant charges under the Code of Conduct. Russo was unpaid at this time and the City claims that he was suspended. There was no basis to order Russo to appear and threatened violation of the Code of Conduct as Russo had already been suspended and re-suspended for nearly five years.

This conduct was done merely to harass Russo. Similarly, the Chief's failure to discipline the conduct of Lawlor and Kornbrath demonstrates that Marquis deliberately took action against Russo to prevent his return to work and continue the harassment against Russo.

Russo has suffered great emotional distress from the conduct of Marquis. Plaintiff's 56(a)2 Statement Section IX(B).

24

### H.    RUSSO PROPERLY BRINGS SUIT AGAINST MARQUIS IN HIS OFFICIAL CAPACITY.

While a suit for injunctive relief may be prosecuted against a state officer in his official capacity, "a suit for money damages may be prosecuted against a state officer in his individual capacity for unconstitutional or wrongful conduct fairly attributable to the officer himself, so long as the relief is sought . . . from the officer personally." <u>Alden v. Maine</u>, 527 U.S. 706, 757 (1999). Plaintiff's § 1983 claims should not be dismissed against the Police Defendants in so far as they seek injunctive relief.

### I.    MARQUIS IS NOT ENTITLED TO QUALIFIED IMMUNITY.

The doctrine of qualified immunity provides that: "government officials performing discretionary function, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." <u>Moffit v. Brookfield</u>, 950 F. 2d 880, 885 (2d Cir. 1991).

"The relevant inquiry is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted. Thus, as the Supreme Court has pointed out, qualified immunity protects all but the plainly incompetent or those who knowingly violate the law." (Emphasis added; internal quotations and citations omitted) <u>Stephenson v. Doe</u>, 332 F.3d 68, 77-78 (2d Cir. 2003).

25

"A court evaluation a claim of qualified immunity must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all, and if so, proceed to determine whether that right was clearly established at the time of the alleged violation." Wilson v. Layne, 526 U.S. 603, 609 (1999).  If the court finds that a clearly established right of the plaintiff has been violated, the court must then determine whether the defendant's actions "could reasonably have been thought consistent with the rights they are alleged to have violated." Anderson v. Creighton, 483 U.S. 635, 638 (1987).  The Supreme Court has held that "a claim of immunity is conceptually distinct from the merits of the plaintiff's claim that his rights have been violated." Mitchell v. Forsyth, 472 U.S. 511, 527-28 (1985).  Qualified Immunity is an affirmative defense, and as such the burden is on defendant to establish its existence.  See In re: State Police, 88 F.3d 111, 123 (2d Cir. 1996).

Russo requested to be returned to work in a safe environment to Chief Marquis on April 12, 2001, which was never provided.  Around April or May 2002, Russo is ordered to report to Manchester Police Department to take part in an interview/meeting, at this meeting Lieutenant Neil Drife, Sergeant Ed Pawlina were to be present, concerning an internal matter. (Implied in letter that it was not safe to go to HPD, they sent him to Manchester) A failure to appear by Russo would warrant charges under the Code of Conduct. Russo was unpaid at this time and the City claims that he was suspended. There was no basis to order Russo to appear and threatened violation of the Code of Conduct as Russo had already been

26

suspended and re-suspended for nearly five years.

This conduct was done merely to harass Russo. Similarly, the Chief's

failure to discipline the conduct of Lawlor and Kornbrath demonstrates that

Marquis deliberately took action against Russo to prevent his return to work and

continue the harassment against Russo.

### **CONCLUSION**

For the foregoing reasons, Defendant's motion for summary judgment on

Plaintiff's First, Second, Fifth, Sixth and Ninth Counts should be denied.

THE PLAINTIFF,
NICHOLAS O. RUSSO, JR.

By: _____
James Brewer
Erin I. O'Neil
Brewer & O'Neil
818 Farmington Avenue
West Hartford, CT 06119
(860) 523-4055
Federal Bar # ct 23073

27

## CERTIFICATION

This is to certify that the foregoing has been faxed on March 19, 2004, to all counsel and pro se parties of record:

Charles L. Howard, Esq.
Gregg P. Goumas Esq.
Derek Mogck, Esq.
Shipman & Goodwin LLP
One American Row
Hartford, CT 06103-2819

John P. Shea, Jr.
Sabia & Hartley, LLC
190 Trumbull Street
Suite 202
Hartford, CT 06103-2205

Frank Szilagyi, Esq.
Silvester, Daly & Delaney
72 Russ Street
Hartford, CT 06106

Attorney Helen Apostolidis
Office of Corporation Counsel
City of Hartford
550 Main Street
Hartford, CT 06103

_____
Erin I. O'Neil